HIGGINS, Justice.
 

 Intervener, as holder and owner of certain bonds and interest coupons, which were
 
 *451
 
 payable at the Hibernia Bank & Trust Company, in New Orleans, on March 1, 1933, claimed a lien and privilege on the general assets of the bank, under Act No. 63 of 1926, on the ground that the bank was the agent for collection, remittance, or delivery of the proceeds, and not a depositary of them.
 

 The liquidators denied that this was a collection and remittance or delivery banking transaction and averred that the funds were deposited under the express and implied authorization of the owner or principal, for the purpose of paying the maturing obligations.
 

 There was judgment in favor of the intervener, as prayed for, and the liquidators have appealed.
 

 The record shows that the Pensacola Hotel Company, on March 1, 1929, executed mortgage bonds in the sum of $500,000, the bonds and coupons maturing semiannually from September 1, 1929, to March 1, 1944, both inclusive. In the mortgage contract or indenture, the hotel company appointed the Hibernia Bank & Trust Company, as corporate trustee, and Louis V. De Gruy, as cotrustee. Fifteen' $1,-000 bonds, 376 $30 coupons and 60 $15 coupons, matured on March 1, 1933, totaling $27,180. This amount was due and payable to the Hibernia Bank & Trust Company, corporate trustee, under the express provisions of the indenture, and the trustee’s fee for handling this payment was $45.96. In order to provide the necessary funds to meet the maturing obligations, the corporate trustee, which held certain mortgage notes as additional collateral in connection with the bond issue on November 12, 1932, collected from the makers of these notes the principal and interest on the note maturing 114 months after date, and under an express authorization in the indenture, held the cash, representing the proceeds of the note, as additional collateral in lieu of the note itself. This money, amounting to $8,518.16, in accordance with the customary way of handling the funds since September 3, 1929, was deposited to the credit of the “Pensacola Hotel Company’s bond payment account First Mtg. Guar.
 
 6%
 
 SG. Bonds,” on November 12, 1932. On January 26, 1933, another collateral note for a like amount matured and the transaction, as well as the disposition of the funds, was handled in an identical way. On January 27, 1933, the bank notified the hotel company that the note was paid and on February 1, 1933, the hotel company wrote the bank, as trustee, that the “said monies are to be used in payment of our bond issue of March 1, 1933. Please send note to First Bank and Trust Company, keeping money in lieu of note.”
 

 Prior to March 1, 1933, the hotel company wrote the corporate trustee, inquiring as to the amount of cash it held in order to know the amount needed to make up the difference between the amount on deposit and the amount necessary for the payment of the maturing bonds and coupons due on March 1, 1933. The trustee replied that it held $16,880.76, and that an additional sum of $10,345.30, plus the trustee’s fee, would be needed to meet the obligations. The hotel company, on February
 
 *453
 
 27, 1933, forwarded that amount in the form of New Orleans Exchange, and in its letter specified the coupons and bonds which were to he retired, setting forth the whole matter in detail. This amount was likewise deposited to the credit of the hotel bond payment account. These facts are shown by the indenture, the ledger of the bank, and the correspondence which was exchanged in connection with the remittances.
 

 The indenture representing the terms and conditions of the mortgage agreement between the Pensacola Hotel Company, the bond holders and the trustees, on page 20, contained the following provisions:
 

 “Section 2. It (meaning Pensacola Hotel Company) will duly and punctually pay or cause to be paid the principal and interest of every bond issued hereunder and secured hereby, in gold coin of the United States of America, of or equal to the standard of weight and fineness existing March 1, 1929 in accordance with the terms hereof, at such time and in the place and in the manner mentioned in such bonds and the coupons thereunto belonging, according to the true intent and meaning thereof,
 
 and for that purpose will deposit with the trustee before the respective maturities of the installments of principal and interest, the amount
 
 necessary to fully pay the same.
 

 “Upon receipt of
 
 such deposit
 
 the Trustee shall set the same apart for the payment' of such maturing bonds and coupons, and thereafter,
 
 such maturing bonds and coupons shall be deemed to be paid and discharged
 
 and not outstanding for any of the purposes or entitled to any of the benefits of this mortgage, and the money so set apart shall be held by the Trustees for,
 
 and be paid by them to, the holders of said bonds and coupons at or after the maturity thereof,
 
 when the same shall be surrendered to the Trustees, duly assigned to hear if registered; but the Trustees shall in no event be liable beyond the
 
 amount so deposited
 
 with them.” (Italics ours.)
 

 On March 1, 1933, some of the bond and coupon holders presented them for payment and they were, paid in full, as shown by the bond and coupon ledger sheet entitled “Hibernia Bank & Trust Company, Trustee Pensacola Plotel Company Bond Payment Account First Mtg. Guar. 6% SG Bonds,” and by the testimony.
 

 The other bonds and coupons, including those held by the intervener, were not presented for payment on their maturity date. The Hibernia Bank & Trust Company was closed on March 2, 1933, under certain orders and a proclamation of the authorities, and the intervener presented its coupons and bonds for payment on March 3, 1933, when the bank was on a five per cent, restricted basis. Intervener had been recognized as an ordinary creditor and had been paid its pro rata of liquidating dividends, but sued for the balance due, claiming a lien and privilege.
 

 The corporate trustee carried ■ out all of the terms of the indenture, except that it did not segregate or earmark the funds placed by the hotel company with it for payment of the coupons and bonds, but permitted these deposits to become com
 
 *455
 
 mingled with its general funds. It also failed to pay a number of the coupon and bond holders in full, in accordance with the indenture.
 

 The intervener admits that it did not place its bonds and coupons with the Hibernia Bank & Trust Company, as agent for collection, remittance, or delivery, but presented them solely and only for payment. It contends that under the terms of the indenture agreement, since payment to the corporate trustee discharged the hotel company -as mortgage debtor, the bondholders are legally subrogated to all of the rights of the hotel company; and that, as the Hotel Company placed the notes and New Orleams exchange with the Hibernia Bank & Trust Company for collection, remittance, or delivery, and not for deposit, but for payment to the hotel company’s order, as principal, under the provisions of Act No. 63 of 1926, as interpreted by this court in Re Liquidation of Hibernia Bank & Trust Company, Jones County, Intervener, 181 La. 335, 159 So. 576, intervener is entitled to a lien and privilege on all of the bank’s assets.
 

 Conceding that the bond and coupon holders and owners are legally subrogated to fhe hotel company’s rights, a view most favorable to the intervener, but without deciding that issue, we shall pass to a consideration of whether or not the construction placed by this court upon the statute in the-Jones County Case is sound. The intervener asserts that it is correct and the liquidators contend manifest error has been committed and gross injustice to innocent depositors has been done and will continue to be done to them by adhering to and following that case. At the time that decision was rendered there were six justices on the bench, one having died. The opinion was by a divided court and is the only decision in point by this court with reference to this question. Some time later, in two articles in the Tulane Law Review, the authors criticised the majority view and agreed with the dissenting opinion. It appears that a number of other interventions of a like nature were filed in the civil district court. The attorneys for the liquidators refused to accept the Jones County Case as a correct expression of the law and opposed the claims of interveners. In one of these interventions, in the liquidation proceedings of the Interstate Trust & Banking Company, in Division A of the civil district court of the parish of Orleans, the trial jttdge, Hon. Hugh C. Cage, pointed out what he considered to be the errors in the Jones County decision, but followed it solely and only on the ground that he was obliged to do so, being a judge of an inferior court. The written reasons of our learned brother below contain such a clear explanation of the history and purpose of the statute and analysis of its provisions and the pertinent authorities on this issue, showing.that this court erred in its interpretation of the act in the Jones County decision, we quote the opinion with approval :
 

 “The balance of the claim is $2,562.50, There can be no doubt but that that comes directly within the purview of the jurisprudence established by the Supreme Court in the Jones County Case (In re Liquida
 
 *457
 
 tion of Hibernia Bank & Trust Co. Jones County, Intervener (1934) 181 La. 335, 159 So. 576. I am going to take the liberty here of saying that with all due deference and with all due respect to the Supreme Court, I am convinced that an error was made in rendering that decision. I may say in passing that this conviction is substantiated by the criticism of the case contained in IX Tulane Law Review 301. See also IX Tulane Law Review, 416-628.
 

 “Let us state briefly the history of banking where it commenced in England and Continental Europe. The goldsmiths of early days necessarily had on hand quantities of gold and silver. In order to protect such stores of valuables they had what they called ‘strong boxes’ but which in these days would be called ‘safes’. The strong boxes were so powerfully built that they were able to effectually defy the ingenuity of burglars of those days and, as an additional protection, the goldsmiths lived over their shops and provided themselves with watchmen in the shops during the night-time. The custom then arose for citizens who had received quantities of gold and silver to carry it to a goldsmith in whose 'integrity they had full confidence and to ask the goldsmith to ‘keep his cash for him.’ The goldsmiths in the course of time found that these sums of money in gold or silver coin remained with them for considerable periods of time, and would be drawn out ordinarily in part, and not in whole, and in the course of events, new deposits came in as fast or faster than the old ones were taken out.
 

 “In those days, men wished to borrow money and pay interest therefor, as has been the case almost. from the dawn of history. The goldsmiths soon perceived that they could loan not only their own money on interest, but they could safely loan money entrusted to them for safekeeping, keeping on hand a reserve sufficient to meet any demands that might be made upon them in accordance with the experience of past years, so, thus in effect, the goldsmiths were really bankers. We read in history that the goldsmiths would frequent the exchanges and other places where men of means’ congregated, soliciting in these words ‘Let me keep your cash.’ This continued until later in civilization banks eo nominee were established and, gaining the confidence of the people, the goldsmiths went out of business. In the course of time banks became numerous, and in these United States, where free trade exists in the forty-eight states, and business is done by people who are separated by hundreds and even by thousands of miles, indebtedness arose.
 

 “These banks, all without exception had corresponding banks scattered over the whole United States. Where a man had a credit in some place where he was doing business, either of money on deposit subject to his check, or where he had received a check from his distant debtor, it was soon found that the most convenient of all collectors were the banks themselves, and owing to this ease and convenience, practically all of the papers of separated debtors and creditors were collected
 
 *459
 
 through the agency of banks. This system has been going on for much longer than one hundred years, probably nearer one hundred and fifty years in this .State of Louisiana. Such employment of banks to collect paper calling for money from a distant place became universal.
 

 “The question that is now presented to us is the interpretation of Act No. 63 of 1926— an act that in my opinion, is sharply silhouetted upon this universal custom I have outlined. We are concerned primarily with the first section. For convenient reference I quote that section in full:
 

 “ ‘Be it enacted by the Legislature of Louisiana, that when any bank receives as agent (whether as agent of another bank or of any person, firm or corporation) for collection and remittance or delivery to its principal and not for deposit any bill, note, check, order, draft, bond, receipt, bill of lading, or other evidence of indebtedness, or other instrument, and collects or realizes any money on the same, and has not deposited same to the credit of said principal, the principal shall have a privilege on all of the property and assets of said agent bank for the amount so collected or realized by said agent bank, which privilege shall be superi- or to the claims of all depositors of said agent bank, the claims of all creditors of said agent bank having no privilege and to all other general privileges on the property and assets of said agent bank, except those for law and judicial charges.’
 

 “Prior to the year 1926 banks in this State had repeatedly failed after having collected paper entrusted to them by individuals solely for the purpose of effecting collection. Up to that time there was no law in Louisiana which gave any lien or preferential payment to the one who employed the bank as such collector. The unfairness of the law which gave no preference in such cases was demonstrated in what is frequently referred to as the “Crowley Case” or the “Sabine Canal Company Case” (Sabine Canal Company v. Crowley Trust & Savings Bank et al., 164 La. 33, 113 So. 754). This history of that case and of the Act itself will be helpful in arriving at the proper interpretation to be placed upon the act of 1926. I say it will be helpful because the statute stands out upon the background of that case. The act itself takes on an added clearness when it is viewed in the setting of such history. So far as I know, the Supreme Court of this State has never hesitated to resort to the history of an Act to be construed to ascertain its significance. In the case of State v. Nicholls (1878) 30 La.Ann. 980, at pages 982, 983 our Supreme Court said:
 

 “ ‘A rule of statutory construction, the soundness of which is attested by long use, and the frequent and continuing approbation of judicial tribunals, is that the intent of the lawmaker is to be ascertained by inquiring what was his motive in legislating —what was the mischief sought to be avoided or remedied, and what the object or good to be attained. Contemporaneous history may be resorted to, and the discussions attendant upon the progress of the legislation through its various stages, as well as the project of the law, in order to discover the meaning and scope of the law itself. Subsequent legislation also upon the same subject, or upon cognate matters,
 
 *461
 
 is useful as furnishing an interpretation of previous words, and in fixing their import.
 

 “ ‘Now if we separate the expressions referred to from the act and ignore the general tenour of the law, and disregard, or refuse to consider, its history and the circumstances attendant upon, and which provoked its birth, so to speak, there could be given but one construction of the phraseology of the thirteenth section of the Funding Act. And that construction is opposed by the history of the legislation, by the intent of its framers as disclosed at every anterior stage of its progress, by the reasons and motives which were assigned as inducements for its adoption, and by arithmetical demonstrations of the basis upon which the consolidated debt was calculated.’
 

 “It is further said by numerous authorities that it should not be presumed that the Legislature acted unadvisedly or mistakenly, but the presumption is on the contrary that the Legislature acted well informed upon a particular subject matter and by a study of every pertinent circumstance which might or may have influenced its determination or colored the meaning of the words it chose to employ. A statute should be construed with reference to the habits of the business prevalent among the people to whom the statute applies. For such reasons the history of the act and the evils sought to be remedied become important and -are now discussed.
 

 “Act No. 63 of 1926 was introduced in the Legislature by Senator A. M. Smith. Senator Smith, during the early part of 1926, was in charge of the Bank of Kaplan and as the representative of that bank, he had cashed drafts for several thousand dollars which had been drawn on the Simon Rice Mills by itself and which had attached thereto bills of lading covering certain rice. He also cashed certain drafts drawn by one A. Kaplan on himself. All of these drafts were sent by him to the Crowley Trust and Savings Bank (the very bank that was the defendant in the case of Sabine Canal Company v. Crowley Trust & Savings Bank, supra), wherein he had no deposit, with the request that it collect the drafts and remit the proceeds to the Bank of Kaplan. When the drafts were received by the Crowley Trust & Svgs. Bk., Kaplan was called in and he gave it his check for the aggregate amount of the drafts. The Simon Rice Mills gave to the Crowley Trust & Savings Bank cash in a package sufficient in amount to cover the drafts it had drawn. The Crowley Trust & Savings Bank then transmitted to the Bank of Kaplan its check for the aggregate of these collections but failed before its check cleared.
 

 “Facts similar to those were presented by the Sabine Canal Company, plaintiff in the cited case, in connection with its claim against the Crowley Trust & Svgs. Bank. As a matter of fact, the situations were so similar that the various parties at interest decided it would be best to bring only one suit which would serve as a test case and they decided, therefore, to have the Sabine Canal Company sue and to use the judgment rendered in that matter as controlling the rights of all other similar claimants— hence the ‘Crowley Case’ cited supra.
 

 
 *463
 
 “Therein it appeared that the Sabine Canal Company had sold rice to the Simon Rice Mills and had received from it three sight drafts drawn to its order on the Simon Rice Mills. Bills of lading were attached to the drafts. The Sabine Canal Company gave these drafts (I am excluding reference to certain ' other drafts of which an explanation would be merely cumulative to the discussion of the three specific drafts I mentioned) to the First National Bank of Lake Chas, for collection and the First National Bk. forwarded them to the Crowley Trust & Svgs. Bk. with instructions to collect and remit to it at the Marine Bk. & Tr. Co. of New Orleans, to be by that bank placed to the credit of the First National Bank of Lake Charles. The drafts were received by the Crowley Bank on January 22, 1926, and on the same day the Bank of Arcadia, on behalf of the Simon Rice Mills, took up the drafts by issuing its exchange on New Orleans to the Crowley Bank. Later on the same day, the Crowley Bank returned the exchange for the aggregate amount of the drafts to the Bank of Arcadia and had it issue in lieu thereof $5,000.00 in money and other New Orleans exchange for a lesser amount. The following day, that is on January 23, 1926, the State Bank Commissioner took charge of the Crowley Bank, and the Bank of Arcadia at the request of the plaintiff and the First National Bank of Lake Charles, stopped payment on its exchange so that the Crowley Bank was never able to convert the exchange into cash but was thus forced to hold it in the form in which it had been issued by the Bank of Arcadia for the purpose of paying the drafts given to the Crowley Bank by the First National Bank of Lake Charles which in turn had received them from the Sabine Canal Company. The Crowley Bank also had as of the time of its closing approximately $11,000.00 in cash, which represented the residuum of collections, receipts and deposits on the day it was closed and of previous days including, of course, the $5,000.00 cash received from the Bank of' Arcadia.
 

 “It was at first argued that there was no privity of contract between the plaintiff and the defendant bank and that the only redress that the plaintiff had was to sue the First National Bank of Lake Charles, which in turn could sue the defendant bank. The Supreme Court held, however, that a previous decision (Martin v. Hibernia Bank & Trust Co., 127 La. 301, 53 So. 572) indicating that the plaintiffs did not have a right of action against the-Crowley Bank, was not applicable because this was in effect a suit for the particular money and exchange which the defendant bank had received for plaintiff’s checks. After disposing of this contention the Supreme Court then held that as the $5,000.00 cash had not been kept separate and apart from the balance of the cash on hand but was mingled therewith, it was impossible to identify the particular cash received, and the plaintiffs could not be paid by preference out of the money found in the bank. As respects the cash the case was held to be governed by the -principles announced in Young v. Teutonia Bank & Trust Co., 135 La. 66, 64 So.
 
 984;
 
 Id., 134 La. 879, 64 So. 806.
 

 
 *465
 
 “However, in regard to the exchange, the Court held that the drafts had not been collected and that the proceeds had not been mingled with the other assets and funds of the bank. The exchange remained a valid outstanding obligation of the Bank of Arcadia, susceptible of perfect identification and not confused with funds of the defaulting bank. The creditors and depositors of the Crowley Bank had ‘no legal or equitable interest in said exchange, and it would be manifestly unfair and unjust to have the bank commissioner to collect said exchange and to make it an asset of said bank and thus enrich the said creditors, depositors, and stockholders at the expense and injury of the plaintiff.’ 164 La. 33, at page 39, 113 So. 754, 756. The doctrine of Young v. Teutonia Bank & Trust Co. was held not to be applicable because there had been no mingling of funds although, of course, the doctrine of that case would have been controlling if the exchange had actually been collected, and the proceeds thereof mingled with the assets of the Crowley Bank. Under these circumstances, the Supreme Court held that the plaintiff was entitled to the proceeds of the exchange in preference to any other claimant and the judgment of the District Court was set aside so as to grant the plaintiff such relief.
 

 “Based on the decision rendered in the Sabine Canal Company Case, the Bank of Kaplan, in charge of Senator Smith, regained from the Crowley Bank the cash which the Simon Rice Mills had paid the Bank of Crowley to take up its drafts because it so happened that this cash -was still in the original package in which it had been given to the Crowley Bank. Unfortunately the Bank of Kaplan could not collect the amount of the Kaplan drafts which had been taken up by checks drawn by Kaplan on the Crowley Bank itself as there was no way of distinguishing the funds used by Kaplan to pay his drafts.
 

 “While the Sabine Case was in the process of litigation, Senator Smith gave some thought to the injustice that could be done the Bank of Kaplan if it should be unable to collect the full amount of its claim from the Crowley Bank. The Bank of Kaplan at no time had a deposit with the Crowley Bank. It did not rely upon its financial stability but sent the drafts which it held to the Crowley Bank for collection, and also for immediate remittance of the funds used to pay the drafts. It contemplated continuous action without any right on the part of the Crowley Bank to hold the funds in its custody for any length of time. Its duty was to remit the instant it effected collection. This differs essentially from the position of a depositor of the Crowley Bank, for a depositor intends to trust the credit and standing of the Crowley Bank by letting it hold his funds until such time as he seeks to withdraw them. The Bank of Kaplan contemplated that the Crowley Bank would not hold its funds for any period of time but would remit immediately.
 

 “Senator Smith then took the matter up with Mr. N. E. North, who was at that time the President of the First National Bank of Lake Charles. It will be recalled that it was the First National Bank that had sent the drafts in the Sabine Case to
 
 *467
 
 the Bank of Crowley. Mr. North was, therefore, as intensely interested as Senator Smith. He agreed with Senator Smith that where an item was sent by either an individual or by one bank to another for collection and remittance, that in that event, the party who sent the item should have a privilege on all of the assets of the collecting bank for the repayment of the collections made on such collection item. As Mr. North agreed with Senator Smith as to the equity in favor of creating a privilege, Senator Smith consulted Chappius and Chappius, attorneys at Crowley, explained the circumstances to them and had Mr. Abner Chappius the elder member of the firm, prepare the Act. It will be seen by reference to the Act how its. very words were selected to cover the two situations considered by Senator Smith and Mr. North; that is, the situation of the First National Bank and also the situation of the Bank of Kaplan. The First National Bank had received the drafts as the agent for the Sabine Canal Company. It was not the actual owner of the drafts, but acting as the agent of the Sabine Canal Company, the owner, it forwarded the drafts to the Bank of Crowley for collection and remittance. Senator Smith’s case was slightly different in that there the Bank of Kaplan was the actual owner of the drafts and had forwarded them directly to the Crowley Trust & Savings Bank with instructions to collect and deliver. If one refers to the act he will see that it provides in section 1:
 

 “ ‘That when any bank receives as agent (whether as agent of another bank or of any person, firm or corporation) for collection and remittance.’
 

 “Which clearly covers (A) the relationship between the Bank of Kaplan and the Crowley Bank, and (B) the relationship between the Sabine Canal Company and the First National Bank. In (A) the Crowley Bank received from the Bank of Kaplan the drafts which the latter had cashed for the drawers and which it desired to have collected. In (B) the First National Bank had received the drafts as agent of the Sabine Canal Company. Both situations came within the first seven words of the statute, i. e., ‘that when any bank receives as agent * * *.’ In the first case, that is, the situation (A) the Crowley Bank received the drafts as agent of another bank, i. e. the Bank of Kaplan — hence the verbiage in the act ‘whether as agent of another bank.’ In situation (B) the First National Bank received the drafts as agent of a company not a bank — hence the statute contains immediately after the words ‘whether as agent of another bank’ additional verbiage reading ‘or any persons, firm or corporation.’ In- each case the bank receiving the items from the owner was to collect and remit the proceeds back to the owner. Thus when the Crowley Bank collected the drafts sent it by the Bank of Kaplan it was expected to remit such collections to the Bank of Kaplan — the owner of such collection items. The First National Bank was expected to do likewise quo ad the Sabine Canal Company, its principal.
 

 “It will be noted too that the statute not only provides for the receipt of an item ‘for collection and remittance’ but also says ‘or delivery.’ The term ‘delivery’ occasions some confusion and causes one to
 
 *469
 
 wonder whether or not it was intended to cover a situation where someone places money in a bank with instructions to the bank to deliver it to some third person, as lor instance, the situation of the opponent in this opposition who contends in effect that it placed the money there for delivery to the bond and coupon holders. Senator Smith, I am informed, has been asked by the attorneys for the liquidating bank what, was meant by the use of the word ‘deliver.’ I am informed that Senator Smith replied that when the Bank of Kaplan sent the drafts to the Crowley Bank it did so with instructions to collect and remit the proceeds; that is, collect the item and then by draft or exchange or in specie, remit the proceeds to the Bank of Kaplan, but it was conceivable that an individual may have owned the drafts forwarded by the Bank of Kaplan. He may have had no particular address to which he would want the proceeds of the collection sent. He might have walked in the office of the Crowley Bank, presented the drafts to them with instructions to collect and instead of remitting the proceeds, have told them to deliver such proceeds to him when he returned after the item had been collected. The term ‘delivery’ was not intended by the framers of the act to contemplate delivery to a third person, nor was the word ‘remittance’ used in the sense of remitting to some third person. Every situation presented by the Sabine Case and thought of by Senator Smith and Mr. North contemplated the proceeds of the collection item going back into the hands of the original party who owned the item and who gave it to the bank to collect. The entire basis and trend of thought in the discussion at the time the Act was prepared was to take care of collection items.
 

 “It will be seen too that the act provides in Section 1 that the ‘principal’ shall have a privilege for the amount collected. There is no clear explanation given to the term ‘principal.’ The reason for the failure to explain it is that the parties framing the act contemplated no ambiguity, believing that only one principal could exist, namely "the one giving the item to the bank for collection. I might point out in the connection that it seems to me to be preposterous to contend that the act intended to apply to trust situations of which country banks in 1926 were entirely ignorant.
 

 “As I gather it, the entire thought and intent of the Legislature was to protect merely parties depositing items for collection, items which were to be continuously in the process of transit, and were neither to be held by the bank nor were the proceeds to be held by the bank for any length of time after collection was effected. The House and Senate journals show that this Act was passed unanimously. The modifications suggested while the Act was being passed was the addition of the words ‘not for deposit’ (which was obviously intended to show that collection items only were to be protected by the statute) and a small ‘s’ as the initial letter of the word section. It is significant to note that at the same session of the Legislature there was passed an act exonerating banks from liability as forwarders of items for collection (Act No. 86 of 1926). Such an act as that is consonant with the thought that the bank
 
 *471
 
 should not be liable because the owner of the item would be protected by the privilege created by Act No. 63 of 1926. It should be noted also in this connection that the Legislature at the same session passed Act No. 91 of 1926, forbidding a bank to pledge its assets to secure private deposits. The underlying idea of equality as expressed in that statute should be paramount in the mind of one charged with the duty of construing Act No. 63 of 1926. Its interpretation should be shaped to the same end. Thus only will there be symmetry in the legislative action and justice in its purpose. Thus only will there be prevented the unfairness of dividing with the depositors of a bank the proceeds of items belonging to one who never intends to trust the credit and financial standing of a bank but who avails himself solely of its collection facilities — an injustice already referred to herein in the very words used by our Supreme Court in the Crowley Case (See 164 La. 33, at page 39, 113 So. 754) — and at the same time, because of the privilege so created by Act No. 63 of 1926, relieve the forwarding bank from liability because of failure of the bank to which the paper- has been forwarded (Act No. 86 of 1926), and still maintain as between all others dealing with the bank the fundamental civil law idea of equality (Act No. 91 of 1926).
 

 “The interpretation of the Act now advanced is supported by section 2 (Act No. 63 of 1926) which goes further into the situation of items presented to a bank for collection. It provides that when any bank sends to another bank domiciled at a different place, a check or draft drawn on the latter bank by a depositor of such drawee bank and such drawee bank shall have charged or debited the account of such depositor with said check or draft and shall have drawn a check or draft on any bank in representation of the amount thereof, that then the first bank should have a privilege on all of the property and assets of the secondly mentioned bank to secure the payment of a check or draft. That section was designated to cover the Kaplan drafts which the Bank of Kaplan had cashed, and whose drafts payable at the Crowley Trust & Savings Bank had actually been taken up by Kaplan’s check on the Crowley Bank and which proceeds the Crowley Bank was actually remitting by its check to the Bank of Kaplan when it failed.
 

 “The purpose of the lawmakers, clear enough, I believe, upon the surface of the Act, becomes of greater clarity when the Act is viewed in the settings of this history I have given. The scheme of the legislation becomes symmetrical and consonant when the Act is read in the light of those other statutes to which I have referred and which were passed at the same Session. Particularly is this so when the two sections of the Act in question are viewed together. This history shows that the Act was designed to cover collection items and was passed at a time when the attitude that the Supreme Court might take in such matters was very doubtful. Moreover it should be borne in mind in construing the statute that the terms ‘collection and remittance’ have in banking parlance a particular meaning. They refer to what is known as ‘cash items’ — ‘transitory items’ — never to be left in the bank. See in this connection the testimony taken
 
 *473
 
 on the trial of the opposition of the Orleans Parish School Board. In this connection I should point out that our Civil Code provides in articles 14 and 15 that words in use in a particular business or profession are presumed to be used in the sense in which they are understood in that business or profession. The terms ‘collection and remittance’ should be given its accepted meaning in banking circles and construed accordingly in the Act.
 

 “The learned counsel for the various opponents herein contend that Act No. 63 of 1926 as interpreted by the decision in the Jones County Case, supra, grants a privilege whenever a bank collects the proceeds of an instrument of indebtedness and is to do anything else with those proceeds, no matter at how far distant a time in the future. Some contend that the privilege runs in favor of the one transmitting the item' to the liquidating bank. Others may say it is granted to those for whom the proceeds of the checks are intended. The sums claimed in the oppositions involved in this distribution amount to $1,300,000.00, of which approximately $1,200,000.00 are asserted to come under the Jones County decision. That decision, construed as counsel for opponents would have me do it, would in effect be at variance with principles announced in the case of Young v. Teutonia Bank & Trust Co., after that decision had remained undisturbed for many, many years and when it was in effect a reiteration of the settled jurisprudence of this State for approximately one hundred years. The change contended for by opponents is too sudden to be accepted as intended unless unmistakenly declared.
 

 “In the case of Church of Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226, and glaringly in the case of Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016, the Supreme Court of the U. S. laid down with great force and clearness the doctrine that in construing a statute it is the duty of the Court to seek out the intention of the Legislature and to give effect thereto in the same manner and to the same extent that it construes a will to determine the intention of the testator, or a contract to determine the intention of the parties thereto, and that no matter how broad and comprehensive may be the language employed by the statute, if it was not the intention of the Legislature to cover a particular case by that broad and comprehensive language, that then no effect should- be given .to it because the Legislature did not so intend. In all of these oppositions there is not a single one that comes clearly within the words of the act of 1926, as I read, it, and there are few that come within the construction given it in the Jones County Case. But even if the language of the act is as broad as opponents contend, it is then the duty of the court to restrain its operation within narrower limits than its words import, if the Court is satisfied that their literal meaning would extend to cases which the legislature never intended to include.
 

 “The earliest case of which I have any knowledge on this subject is the historical case concerning drawing blood on the streets of Bologna. We are told historically that Bologna was then an independent self-governing city, and was plagued and steeped, by sword or dagger on its streets,
 
 *475
 
 so that blood flowed, and determined to put an end to it, the governing authority of the City of Bologna passed a law that whoever drew blood on the streets of Bologna should suffer death.
 

 “In those days no physician ever ventured out of his house without his lancet in his pocket, any more than he would go out without his shoes or hat on, and no matter what happened to any patient the first thing a physician did was to take out his lancet and let out blood.
 

 “A man fell down in a fit on the streets of Bologna, and a physician happened to be passing at the time. He was called, and he immediately whipped out his lancet, bared the arm of the man, found his vein, opened it, and blood spurted on the streets of Bologna. The physician was indicted and tried, and the Court held that although he came within the absolute terms of the law, yet such an occurrence was not within the intention of the lawmaker.
 

 “Again, in England, Parliament passed a law providing that 'anyone who broke jail should be hanged. A prisoner was in a jail which caught fire, he broke out, was indicted and tried, and the Chief Justice stated that such a case was not within the meaning and intention of Parliament when it passed the law, and that the man should not be hanged because he would not stay to be burned.
 

 “Again, the Congress of the United States passed an Act providing severe punishment for anyone who hindered or prevented the carriage of the United States mails, either in vehicles, motor-craft, or by men on foot. In one of the States, a letter-carrier was indicted by the Grand Jury for murder and a capias was issued by the Court, and placed in the hands of the. Deputy Sheriff for execution. The Deputy Sheriff found the mail-carrier on his route with his mail-pack. He arrested him under his capia's and carried him to jail, and the Deputy Sheriff was indicted by the Federal Grand Jury for violation of this act. The Supreme Court said, in that case, that while the Deputy Sheriff did what was within the letter of the law, it was not within the intention of Congress, and the Deputy Sheriff was acquitted.
 

 “In our State of Louisiana, in the case of Moulin v. Monteleone, 165 La. 169, 115 So. 447, which went to the Supreme Court from this Division of the Civil District Court, the Supreme Court held in accordance with the opinion of the Judge of the lower Court, that notwithstanding what Monteleone did, or was alleged to have done, was clearly within the broad and comprehensive language of article 2315 of the Civil Code, viz.:
 

 “ ‘Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it * * * ’ that only such cases were in the- purview of that broad and comprehensive language, as were within the intention of the Legislature that adopted it, and that only such cases fell within it as could be shown to give a cause of action under the Roman or Spanish law, and that not only was Monteleone’s action not contemplated, but innumerable other damages were done which
 
 *477
 
 would fall under the broad and comprehensive language quoted but yet would not give a cause of action.
 

 “Excluding all references to the history of the act and to the other statutes I have mentioned, we find an obvious reason for protecting persons who leave an item with a bank for collection. Let us assume for instance that Mr. Jones is the owner of a check drawn on the Calcasieu National Bank of Lake Charles. He has no account with the Interstate Trust & Banking Company of New Orleans but desires to use that bank to collect the check which he holds. He wants to use it merely because it has facilities which permits it to collect the check. He, therefore, goes to the Interstate and leaves the check with them for collection. Let us assume that before the check is mailed to Lake Charles and within an hour or so of the time he left the check with the Interstate, the Bank Commissioner takes charge of the Interstate Bank. Certainly, everyone would agree that Mr. Jones has not divested himself of the ownership of the check drawn by the third person on the Calcasieu National Bank. He ought to be at liberty, and even without the aid of Act No. 63 of 1926 he would have been at liberty to return to the Interstate Bank and obtain the check (Cf. Crowley Case, supra). If the check had actually been sent by the Interstate to another bank in Lake Charles, say for instance the First National Bank, with instructions to collect
 
 the
 
 check from the Calcasieu National Bank, and if after the item had been delivered to the First National Bank, but before it had presented it to the Calcasieu National Bank, the Bank Commissioner had taken charge of the First National Bank, certainly Mr. Jones should be able to regain the check from the First National Bank on the theory that it is his check and he had at no time divested himself of his ownership. If the First National Bank had actually presented the check to the Calcasieu National Bank and obtained payment thereof, but held the proceeds intact, and was then placed in liquidation, Mr. Jones should be able to obtain the proceeds of the check from the First National Bank of Lake Charles on the theory that the proceeds actually belonged to him and were identifiable. Had the proceeds been sent in specie to the Interstate Bank and it had subsequently been placed in Liquidation before commingling the funds, he would obviously be able under the Sabine Case to recover the actual specie money from the Interstate. It appears, however, that in commercial transactions of the type here illustrated it usually happens that a remittance is not sent for each individual check, but that the First National Bank of Lake Charles would have probably been remitting to the Interstate for a number of drafts sent in for collection; conceivably it may have sent certain drafts to the Interstate for collection, and it may have happened that at the time the check held by Mr. Jones was collected there was a balance in favor of the First National Bank and against the Interstate Bank, in which event, the Interstate Bank may have transmitted more items or possibly some cash to the First National to balance accounts. The rights of Mr. Jones should not be affected by the fact that it is more convenient to handle his account by book entries rath
 
 *479
 
 er than by the actual treatment of his check as a separate transaction. To protect him, therefore, when his ownership was extinguished by a commingling of assets it was thought that he should have a privilege. The unfairness of distributing his money to the bank’s creditors is clearly shown by the following language taken from the opinion in the Crowley Case (164 La. 33, at page 39, 113 So. 754, 756):
 

 “ ‘That bank, its creditors, depositors, or stockholders have no legal or equitable interest in said exchange, and it would be manifestly unfair and unjust to have the bank commissioner to collect said exchange and to make it an asset of said bank and thus enrich the said creditors, depositors, and stockholders at the expense and injury of the plaintiff.’
 

 “(I confess I fail to see how the stockholders of the bank could ever profit from such a transaction but I pass that over as besides the point now being discussed.) But there is as I see it no reason at all why the privilege should be extended to the point of protecting third persons who gave no item to a bank for collection. If it were the intention to protect all parties who gave an item to a bank for collection, coupled with some other mandate or some other authorization under which the bank was to take some other step (i. e. whenever any fiduciary relationship, in addition to the collection relationship, is created) then would it not seem reasonable to believe that the privilege ought to exist not by virtue of the collection feature alone but by virtue also of the Acts to be done under the other mandate ? The statute obviously covers only collection items. By that I mean that the Act grants a privilege only if an item is given to the bank for collection. Referring now to the Jones County Case we find from the facts that Jones County placed the Hibernia Bank in funds by giving it a check drawn on the Whitney National Bank. Because Jones County gave a check to the Hibernia, it is contended that the Act applies. Had Jones County given cash to the Hibernia Bank to take care of the payments coming due on its bonds and coupons, obviously Act No. 63 of 1926 would not create a preference in favor of Jones County. No counsel appearing before me herein has disputed that. Now what distinction can there be between Jones County giving a check to the Hibernia and its giving cash to the Hibernia? Certainly the criterion of its legal rights , — the existence of the privilege — should not depend upon whether cash or a check was given to the Hibernia. The proper criterion should be whether the one who gave the item to the bank was trusting its solvency and financial responsibility or whether he was availing himself solely and only of the collection facilities provided by that institution. If he did not intend to trust the solvency and financial responsibility of the bank, but intended solely and only to avail himself of its collection facilities, then he should be accorded the privilege, but in cases where he relies upon its responsibility or places it in' a fiduciary relationship to himself, in which, reliance upon its solvency is involved, then and in that event no privilege should be. granted be
 
 *481
 
 cause then his position is too similar to that of an ordinary depositor who also relies upon the bank’s financial responsibility.
 

 “It is perfectly plain that Jones County never intended to make the Hibernia Bank a collector. Its employment of the Hibernia Bank was as paying agent and in order for it to be able to carry out its mandate to pay the bonds and coupons, it had to place the Hibernia in funds wherewith to do it. The collection of the check was a mere incident; it was not the object of the contract. The object of the contract was that with the money placed in its hands by Jones County, it would pay these coupons and bonds. The handing of the check to it was a mere method of placing it in funds. Had Jones County drawn cash, currency or coin from the Mississippi bank and remitted this currency to the bank by means of the express agencies or the United States mail, or its own private messenger; with instructions to the bank to use the currency to pay these bonds and coupons, it is perfectly plain that no privilege would have been granted or could possibly have been construed as granted by Act No. 63 of 1926. Again, had Jones County sent the check in question to the -Whitney National Bank with instructions to draw currency out of its vault and hand the currency to the Hibernia Bank, there would have been no privilege. I repeat that the use of the check was simply the most' convenient method by which Jones County could place the money in the hands of the Hibernia Bank to discharge its obligations. The fact that Jones County used the most convenient method of getting the money into the bank should not of itself give a privilege, and certainly does not bring the case, in my opinion, within the purview of Act No. 63 of 1926. Had Brown County in Mississippi on the same day, under the same circumstances, handed cash across the counter, Brown County would have had no privilege, and, therefore, with these two counties employing the bank for the same purpose to act as paying agent one (Jones County) would have been decreed by the Supreme Court to have a privilege because it used a check to get the money into the hands of the bank and the other (Brown County) would have had no privilege because it handed currency across the counter with the same letter of instructions. This example seems to me to demonstrate that the Legislature never intended such absurdity. In both instances each county put funds in the hands of the bank to remain there an indefinite- period of time. Both counties knew that the money, whether in cash or as proceeds of a check, was going to be mingled with the funds of the bank and from its general funds the bank was going to pay these bonds and coupons as they were presented. Both counties employed the bank as paying agent and both trusted to the solvency of the bank for the proper use and disposition of the money.
 

 “Again, ‘A’ in New Orleans desires to remit $1,000.00 to his bank in
 
 New
 
 York. He carries $1,000.00 in currency to the Interstate Trust and Banking Company with a letter of instructions to transmit the money to his New York bank to his credit.
 
 *483
 
 ‘B’ on the same day and within the same hour presents his check to the Whitney with instructions to collect it from the Canal Bank, on which it is drawn, and remit the proceeds to ‘B’s’ bank in New York to be placed to his credit. Under these circumstances ‘A’ would have had no privilege and ‘B’ would, the query is, in common sense and common justice why the difference?
 

 “Being, as I am, profoundly of the belief that the intention of the Legislature in passing Act No. 63 of 1926 was solely to give a preference to those persons who had employed banks solely as collectors, and not otherwise, I am obliged to disagree with the opinion rendered by the Supreme Court of Louisiana in the Jones County Case. However, as a Judge of the Lower Court, it is my duty to follow it, and I am for that reason, and for that reason alone, of the opinion that the opposition of the St. Tammany Parish School District No. 2, in the sum of $2,562.50, which is the amount sued for, less the $2.65 which I disallowed, will be sustained.
 

 “The account will be amended accordingly.”
 

 A reading of the statute shows that the Legislature confined the provisions of the act to a transaction where the bank was appointed as agent by the owner of the paper for collection and remittance or delivery. The construction placed upon the act by the majority opinion extended the law to cover a transaction where the agency was for the purpose of payment of the principal’s obligation. There is a clear distinction between appointing a bank as an agent for collection and remittance or delivery of items and appointing a bank as agent to receive payment or to pay maturing obligations of the principal. Jennings v. U. S. Fidelity & Guaranty Co., 294 U.S. 216, 55 S.Ct. 394, 396, 79 L.Ed. 869, 99 A.L.R. 1248. The statute clearly covers only the former but not the latter. In the first instance, the principal does not expressly or impliedly authorize the deposit of the proceeds collected, but instructs the bank, as agent, to remit or deliver the funds to the principal. In the second instance, the principal expressly or impliedly authorizes the agent bank to deposit funds for the purpose of paying debts it owes to others.
 

 In order to grant the privilege claimed by Jones County, the majority opinion placed a liberal rather than a strict construction upon the provisions of the act in favor of the claimant of the privilege, contrary to the established jurisprudence. Civ. Code, art. 3185; Boylan’s Detective A. & P. Police v. Arthur A. Brown & Co., 157 La. 325, 102 So. 417; Ittman et al. v. Kracke & Flanders Co., 12 La.App. 672, 127 So. 106, 107; Dodd v. Horan (La.App.) 121 So. 323; Red River Const. Co. v. Pierce Petroleum Corporation, 165 La. 565, 115 So. 752. For instance, after the words “remittance or delivery to the principal,” the court was compelled to add the words “or order” to make the statute cover Jones County’s claim of privilege; further, it was also necessary to put an unwarranted restricted meaning upon the word “deposit,” so as to confine it to a deposit in a checking account, to take the case out of the ex
 
 *485
 
 press provisions of the statute that it did not cover cases of deposit. In order to arrive at that conclusion, an erroneous construction was placed upon the case of Hall v. Farmers’ Trust & Savings Bank, 177 La. 659, 148 So. 909, 910, to the effect that the deposit must be one to the credit of the principal’s checking account. The only definition of “deposit” given in that case appears in the fourth paragraph, wherein the court put in parenthesis after the words “for deposit,” the following , words: “(meaning the kind of deposit where title passes).” Then the court added “and the bank realizes or collects any money on the instrument, and has not deposited it to the credit of the one delivering the instrument.” Certainly, this court in the Jones County Case was not justified in placing such a limited meaning upon the word “deposit.” Manhattan Co. v. Blake, 148 U.S. 412, 13 S.Ct. 640, 37 L.Ed. 504; Commercial Bank of Pennsylvania v. Armstrong, 148 U.S. 50, 13 S.Ct. 533, 37 L.Ed. 363; Atlantic Gypsum Co. v. Federal Nat. Bank of Boston (C.C.A.) 76 F.(2d) 59; City Council of Charleston v. Elliott (C.C.A.) 73 F.(2d) 920; Krupnick v. People’s State Bank of South Carolina et al. (C.C.A.) 73 F.(2d) 920; Young v. Teutonia Bank & Trust Co., 134 La. 879, 64 So. 806; Foulkes v. Howes, 11 La.Ann. 448, 449; Hotard v. Hotard, 12 La.Ann. 145; Municipality No. 1 v. Millaudon, 12 La.Ann. 769; State ex rel. Jones Holmes v. Wiltz, 11 La.Ann. 439; Fox v. Sloo, 10 La.Ann. 11; Fox v. New Orleans, 12 La.Ann. 154, 68 Am.Dec. 766; Duparquet Huot & Moneuse Co. v. Evans et al., 297 U.S. 216, 56 S.Ct. 412, 80 L.Ed. 591; State v. Poydras’ Heirs, 9 La.Ann. 165; Tulane Law Review, vol. 9, pp. 301-416, and 628.
 

 In view of the error into which we have fallen in interpreting Act No. 63 of 1926, in the case entitled In re Liquidation of Hibernia Bank & Trust Co., Jones County, Intervener, 181 La. 335, 159 So. 576, and the injustice it does to innocent depositors, who are treated as ordinary creditors on a pro rata basis, we are of the opinion that it is our duty to overrule that decision. ,
 

 It is our view that the evidence in this case shows that the corporate trustee, after having performed the mandate to collect funds for the purpose of providing cash for the payment of the bonds and coupons, was expressly and impliedly authorized by the principal to deposit the funds and after the deposit was made, to act as paying agent for the benefit of the hotel company and the owners and holders of the coupons and bonds. Therefore, the intervener does not come within the provisions of the statute and must be regarded as an ordinary creditor. If the bank violated the terms of the indenture in failing to earmark the funds or set them apart in separate packages, and permitted them to become commingled with the bank’s general funds, the bank may be guilty of misconduct, but, even if it did commit an act ex maleficio by commingling the funds, a lien in favor of the bond and coupon holders is not created or granted under the statute or our jurisprudence. Longbottom’s Executors v. Babcock et al., 9 La. 44, 50; Young v. Teutonia Bank & Trust Co., 134 La. 879, 64 So. 806; Civ. Code, art. 3185; Daugherty v. Canal Bank & Trust Co., 180 La. 1003, 158 So. 366;
 
 *487
 
 Tropical Printing Co. v. Union Title Guarantee Co., 180 La. 702, 157 So. 534; In re Liquidation of Canal Bank & Trust Co., Intervention of John F. Clark, 181 La. 856, 160 So. 609; In re Liquidation of Canal Bank & Trust Co. (Intervention of the City of New Iberia) (La.App.) 167 So. 858, decided May 4, 1936.
 

 The liquidators have at all times admitted that the intervener is an ordinary creditor for the amount claimed, subject to certain credits.
 

 For the reasons assigned, the judgment appealed from is annulled and set aside, and, it is now ordered, adjudged, and decreed that there be judgment herein in favor of the Pan American Life Insurance Company, intervener, and against the Hibernia Bank & Trust Company, in liquidation, in the sum of $3,763.75, subject to the credit of such amounts and liquidating dividends which have already been paid, and recognizing the intervener as an ordinary creditor only, to be paid in due course of the administration of the liquidating proceedings, and according to law; appellee to pay all costs of court.
 

 ROGERS and ODOM, JJ., dissent, being of the opinion that the court should adhere to the interpretation which it placed on Act No. 63 of 1926 in the case of In re Liquidation of Hibernia Bank & Trust Co., Jones County, Intervener, 181 La. 335, 159 So. 576, and, on the authority of that case,' affirm the judgment.
 

 O’NIELL, C. J., absent.