**176 So. 1**

## In re INTERSTATE TRUST & BANKING CO.

No. 34275.

June 21, 1937.

Rehearing Denied July 8, 1937.

Walter F. Marcus, Bert Flanders, Jr., Fred. A. Kullman, and L. T. Kuhner, all of New Orleans, for Jasper S. Brock, State Bank Commissioner, et al., and his special agents, in charge of the liquidation of the Interstate Trust & Banking Co., proponents of the account, appellees and appellants.

Milling, Godchaux, Saal & Milling and M. Truman Woodward, Jr., all of

New Orleans, for Mrs. Ike T. Rhea and. A. Rosenberg, appellants.

Monroe & Lemann and Walter J. Suthon, Jr., all of New Orleans, for Fernwood & Gulf Railroad Co., opponent, intervener and appellant.

Monroe & Lemann and Walter J. Suthon, Jr., all of New Orleans, for Blaise-Iberville Garage, Inc., and others, opponents and appellants.

John O'Connor, of New Orleans, for St. Tammany Parish School Dist. No. 2, appellee.

Cahn & Cahn, of New Orleans, for Conrad Kolb, intervener and third opponent, appellant.

Frank W. Hart and Lemle, Moreno &. Lemle, all of New Orleans, for N. V. Nederlandsche Koloniale Handelsvereening and Rouwenhorst Mulder & Co., appellants.

Monroe & Lemann and Walter J. Suthon, Jr., all of New Orleans, for Jackson State Nat. Bank, trustee for I. C. Enochs,. Lucy E. Robinson, Martha E. Enochs,. Mary E. Neugent, and Edwina E. Flowers,. substituted opponent and intervener, appellant.

Milling, Godchaux, Saal & Milling and M. Truman Woodward, Jr., all of New Orleans, for Robert William Elsasser and Charles B. Stewart, successor cotrustees, appellants.

Milling, Godchaux, Saal & Milling and. M. Truman Woodward, Jr., all of New Orleans, for Bayou Terre-Aux-Boeufs Drainage Dist. and Bondholders Pro—

tective Committee thereof, appellants and appellees.

Racivitch & Hickerson, of New Orleans, for William H. Hickerson, Jr., appellant.

Henry & Kelleher, of New Orleans, for Percy H. Sitges, individual trustee and Louisiana Savings Bank & Trust Co., successor corporate trustee of Bondholders of Hattiesburg Grocery Co., appellant.

Scott E. Beer, of New Orleans, for Myron Turfitt, as individual trustee under indenture executed by Coleman Office Co., opponent of the account and appellant.

Carroll, McCall, Plough & Carroll and Henry & Kelleher, all of New Orleans, for State Agricultural Credit Corporation, Inc., appellant.

Deutsch & Kerrigan & Burke, of New Orleans, for Tampa-Tribune Pub. Co. and others, appellants.

Spearing, McClendon, McCabe & Schmidt, of New Orleans, for Egan & Hinckley, appellant.

Arthur A. de la Houssaye, of New Orleans, for Dr. George D. Feldner and Mrs. Ella L. Rich, appellants.

George Seth Guion, of New Orleans, for Herman A. Cook, appellant.

Pierre D. Olivier and Chas. T. Madison, both of New Orleans, for Joseph C. Maurer, Jr., interdict, opponent and appellant.

Emerson Bentley, of New Orleans, for Police Jury of Jefferson Parish, La., appellee.

Carroll, McCall, Plough & Carroll and Miller, Bloch & Martin, all of New Orleans, for Boston Club, appellant.

Denegre, Leovy & Chaffe, of New Orleans, for Lynchburg Theatre Corporation and others, interveners and opponents.

Schwarz, Guste, Barnett & Redmann and Denegre, Leovy & Chaffe, all of New Orleans, for Olive Hotel Property, Inc., and Percy H. Sitges, individual trustee, opponents and appellants.

Schwarz, Guste, Barnett & Redmann, of New Orleans, for Tampa Theatre Buildings, Inc., and Percy H. Sitges, trustee, opponents and appellants.

Denegre, Leovy & Chaffe, of New Orleans, for J. W. Ware, Charles B. Thorn, and Henry H. Vatter, substitute trustees—Interstate Inv. Co., Inc., collateral trust notes, opponents and interveners.

Denegre, Leovy & Chaffe and John L. Toler, all of New Orleans, for Percy H. Sitges, individual trustee under deed of trust and mortgage executed by the Commercial Inv. Corporation, dated as of June 1, 1928, opponent and intervener and appellant.

Emmett Alpha, Baldwin, Haspel & Molony, Walter M. Barnett, Francis P. Burns, Elias Bowsky, Cobb & Jones, Frymire & Ramos, Guion & Upton, Frank W. Hart, Henican & Carriere, Albert B. Koorie, Lazarus, Weil & Lazarus, Oliver S. Livaudais, Leander H. Perez, E. M. Robbert, and Max M. Schaumburger, all of New Orleans, for other interveners and opponents.

ROGERS, Justice.

In the early part of the month of January, 1934, Jasper S. Brock, State Bank Commissioner, acting under the authority of Act No. 300 of 1910, took possession of the Interstate Trust & Banking Company, of the city of New Orleans, for the purpose of liquidating its business and affairs. The Bank Commissioner appointed O. H. Pittman and Walter Cook Keenan as his special agents to take charge of the liquidation and he also approved and confirmed the appointment of Charles W. Hogan as liquidator. Shortly after taking charge of the bank, the Bank Commissioner and his assistants, in an effort to obtain funds for distribution to the 34,000 depositors of the defunct institution, applied to the Reconstruction Finance Corporation for a loan of several hundred thousand dollars. They obtained the loan, and its avails, together with the cash on hand, was sufficient to enable them to propose a distribution of 10 per cent. to every depositor. Accordingly, on June 23, 1934, the proposed distribution was presented to the court in the form of a provisional account, which was duly advertised as required by law. Claimants immediately began filing oppositions to the account, demanding to be paid by preference, either because of alleged paramount rank of their respective claims, or because of alleged privileges upon the assets of the defunct bank. A total of 98 oppositions was filed to the liquidators' account. Two of these oppositions were dismissed on motion of the opponents, and one was not submitted for decision, under an agreement of counsel.

The 95 oppositions presented for judicial determination amounted in the aggregate to $1,301,864.80 and involved a variety of legal questions. The liquidators filed a plea in bar as a defense to 89 oppositions. The plea was overruled by the trial judge, necessitating a trial of each opposition upon its merits. Several months were required for taking and transcribing the testimony and several weeks were required for completing the arguments. The trial judge rendered a judgment maintaining 6 of the oppositions and dismissing the other 89. Accompanying the judgment was an exhaustive and able written opinion, in which the trial judge discussed each opposition specifically, reciting, first, the facts on which the claim for a lien or preference was based and assigning, secondly, his reasons for allowing or disallowing the claim. Sixty-three opponents appealed from the judgment dismissing their demands. The liquidators appealed from the judgment so far as it maintained the claims of 6 opponents. The liquidators also answered the appeals of the 63 unsuccessful opponents.

The first issue to the determined is the issue arising on the plea in bar filed by the liquidators. The plea is founded on the proposition that the opponents against whom it is urged failed to comply with the provisions of section 4 of Act No. 300 of 1910, prescribing a limit of time after the publication of notice for the filing of proofs of claims by creditors other than depositors.

On the trial of each opposition the liquidators proved that after placing the bank

in formal liquidation on January 4, 1934, the Bank Commissioner caused to be published in a local newspaper once each week beginning January 25, 1934 and ending on April 26, 1934, a special notice directed to all persons (other than depositors) having claims against the defunct bank to file the same with the State Bank Commissioner, and make legal proof thereof, at No. 107 Camp street, New Orleans, not later than April 26, 1934. The liquidators also proved that the opponents against whom the plea is urged failed to file their claims with the State Bank Commissioner on or before the date specified in the published notice.

Section 4 of Act No. 300 of 1910 covers all claims against a banking corporation in liquidation—not only claims for deposits, but other claims as well. The section so far as it covers claims other than deposits provides: "That as soon as practicable after taking such possession of a corporation the State Examiner of State Banks shall cause to be published a notice to appear at least once per week for three months in such newspaper as he may select. This notice shall call upon all persons, other than depositors, who may have claims against the corporation to file the same with the State Bank Examiner of State Banks and make legal proof as to the justice thereof, at a place and within a time not earlier than the last day of publication of such notice to be specified therein. If the said Examiner shall doubt the justice or validity of any such claim so filed, he may reject the same and serve notice of such rejection upon the claimant either by mail or personally.

An affidavit of such notice shall be filed in the office of the State Examiner of State Banks and shall be prima facie evidence of such service. An action upon such claim may be brought only within six months after the date of such service." Then follows the provisions covering the claims of depositors.

The liquidators contend that under section 4 of Act No. 300 of 1910, all claimants other than depositors were required to file and make legal proof of their claims on or before April 26, 1934, and that the claims of those opponents who failed to do so are barred by the statutory limitation. We think the contention is well founded and should prevail.

The trial judge properly held that the word "earlier" appearing in the statute was for the guidance of the Bank Commissioner and not for the guidance of the claimants. Under the statutory provision, the examiner (commissioner) is required to call upon claimants other than depositors to file and make legal proof of their claims at a place and within a time to be specified in the published notice. The word "earlier" means that the examiner (commissioner) in fixing the time within which claims must be filed and legal proof thereof made cannot fix a time earlier than the last day of publication. In this case the published notice called upon creditors, other than depositors, to file their claims and proofs not later than the last day of publication. The law requires that the notice must be published for at least once a week for three months. Therefore, in speci-

fying the last day of publication as the expiration date of the period within which claims must be filed and proved, the Bank Commissioner gave to claimants, other than depositors, three full months within which to assert their rights.

The trial judge assigns as his reason for overruling the plea in bar, that the statutory provision relied on by the liquidator does not say that claimants other than depositors shall file their claims with the Bank Commissioner; that it only provides that the commissioner shall publish a notice calling upon them to do so. That the contention of the liquidators requires the courts to pronounce a forfeiture which the Legislature has not created. That forfeitures are not favored and should be declared only where no other decree is possible.

But what the liquidators are asking the court to do in this case is neither unusual nor unreasonable. Statutory provisions barring a claim not filed within a specified time against an estate in liquidation are numerous. The most familiar example of such a provision is the one contained in the National Bankruptcy Act, providing that claims shall not be proved against a bankrupt estate subsequent to six months after the adjudication. Section 57n, as amended by Act May 27, 1926, § 13 (11 U.S.C.A. § 93 (n). The time limit therein expressed effectively bars the subsequent filing of a proof of claim. Hutchinson v. Otis, 190 U.S. 552, 23 S. Ct. 778, 47 L.Ed. 1179; Gilbert's Collier on Bankruptcy (3d Ed.) pp. 763, 764. There are also statutes of a number of the other states, dealing with the liquidation of banking institutions, which provide for the barring of claims after a specified time or within a time to be fixed by the Bank Commissioner or Superintendent of Banks. The reason for such statutory provisions is clearly expressed by the Missouri Court of Appeals in Bowersock Mills & Power Company v. Citizens' Trust Company of Gorin, 298 S.W. 1049, 1051, in the following language, viz.:

"It is perfectly apparent that if there were no provisions for prompt and accurate ascertainment of the liabilities of an insolvent bank, and if there were no provisions for shortening the period of limitation for the presentation of claims and the filing of suits thereon, it manifestly would be impossible for the commissioner to wind up the administration of an estate until the general statutes of limitations had run, and even then, under certain disabilities of claimants, it could not be wound up. Furthermore, if the assets could be allocated pro tanto to the claim of any particular creditor by a decree without first presenting the claim to the commissioner or considered by the court having primary jurisdiction over the estate to determine preferences and priorities, then the estate could be whittled away by successive actions to the prejudice of the rights of other creditors. The whole scheme as laid by the statutes is to compel the presentation of claims within a certain time so that all claims may be determined with reference to the rights and equities of each and every creditor. The statutes undoubtedly are aimed

at inaction and delay. The four months' period for filing claims and the six months' period for bringing suit certainly afford any claimant who desires to assert his rights in court sufficient opportunity and length of time in which to do so."

The reason for the rule is also well expressed by the Court of Appeal of New York in the case of Societa Principessa Iolanda Margherita Disavoia (Fondata Dai Bonitesi) Inc., v. Broderick State Superintendent of Banks, 260· N.Y. 260, 183 N.E. 382, 383. There the court referred to the statute requiring the Superintendent of Banks to notify all creditors to present their claims within four months and also requiring him to accept or reject claims, with the right reserved to any claimant whose claim had been rejected to maintain an action thereon within six months thereafter. After referring to these statutory provisions, the court said:

"These sections provide a comprehensive and exclusive means for the ascertainment of all claims against a delinquent corporation which is in liquidation; for their acceptance or rejection by the superintendent; for the institution of actions to determine the validity of rejected claims; for the ratable distribution of assets among general creditors. No actions or proceedings may be taken for the enforcement of claims not filed within the time prescribed; no suit upon a filed claim may be brought unless instituted within six months from the expiration of the time within which the superintendent must have accepted or rejected the same; no suit upon an unfiled claim may ever be brought. Necessary is it that all claims be filed with the superintendent for the reason that until all such claims are made known to him, a ratable distribution of corporate assets among general creditors cannot be made. Necessary, also, are the provisions strictly limiting the time within which actions may be brought to enforce rejected claims; otherwise prompt distribution to depositors and other creditors of their ratable shares would prove impossible. Thus is provided a scheme whereby all the assets of a debtor are impounded, and held for proportionate distribution among general creditors; thus is prevented the unequal distribution, which otherwise would follow, if general creditors were permitted to recover accordingly as the liens acquired by them might have priority in time. No unfairness to creditors may result, for all must receive notice by publication of the proceedings, and a special class, such as depositors, an additional notice by mail; and all will have an opportunity to present and prove their claims for a proportionate interest in the fund."

It is true that in the Federal Bankruptcy Act and in the various state statutes to which our attention has been directed it is provided in terms that a claim shall be barred if it is not filed within the prescribed period. But that only goes to show that Congress and the various state Legislatures, in order to insure the prompt and equitable distribution of a debtor's estate, have not hestitated to forever bar a creditor who has not filed his claim within a reasonable time. And if the local

statute in equivalent language evidences a like intention and accomplishes a like purpose, the court should not hesitate to effectuate the intention and purpose.

■ It is clear that the general purpose of Act No. 300 of 1910 is to provide a method for the prompt, economical, and equitable liquidation of banks and banking institutions. It is also clear that the provisions of section 4 of the statute constitute an important part of the comprehensive plan provided for such liquidation. And it is not difficult to conceive that the entire plan would be seriously impaired, if not destroyed, if persons other than depositors should be permitted to file their claims at any time their convenience or caprice might dictate.

Analyzing section 4 of Act 300 of 1910, we find that the published notice "shall call upon all persons, other than depositors" to file their claims "and make legal proof as to the justice thereof, at a place and within a time," which, as we have shown, cannot expire earlier than the last day of publication of the required three months' notice.

■ If it was the intention of the Legislature, and we think it was, that all claimants other than depositors should be required to file and prove their claims within a fixed period of time, then it inevitably follows that failure to comply with the requirement bars such claimants from subsequently asserting their claims. If this were not so, the publishing of the notice and the calling upon claimants for the presentation and proof of their claims are but idle ceremonies and are of no legal or practical effect whatever.

■ There is, however, other language in the statute which plainly indicates that the date so fixed is final, and that failure to act within the delay forever bars the claimant. Thus, it is provided that "If the said Examiner [Commissioner] shall doubt the justice or validity of any such claim so filed, he may reject the same and serve notice of such rejection upon the claimant either by mail or personally." Act No. 300 of 1910, § 4. Obviously, the words "so filed" refer to claims filed within the time and manner provided in the published notice. And the commissioner is expressly authorized to reject claims which are filed within the limit of time prescribed. There is nothing in the act which either expressly or impliedly authorizes the commissioner to reject claims that are not timely filed. Hence, it would seem to follow logically that if unfiled claims are not barred, they may be presented at any subsequent time without any fear on the claimant's part of their rejection by the commissioner.

■ Further in the same section, the statute provides the manner in which a claim shall be rejected, and it provides also that, "An action upon such claim may be brought only within six months after the date of such service." Manifestly, this means that a suit upon a claim filed within the designated period and rejected in the specified manner can only be brought within six months from the date of the service of the notice of rejection, wheth-

er such service be given personally or by mail. There can be no doubt that under the language of the quoted statutory provision a claimant served with notice of rejection cannot sue after six months to establish the rejected claim. The statute, it should be observed, provides that the action "may be brought *only* within six months." (Writer's italics.) That provision means, if it means anything at all, that subsequent action is impossible.

If the statute should be interpreted as meaning that claimants other than depositors are not required to file their claims within the designated period, the six months' period provided for the filing of suits on rejected claims could be suspended indefinitely by any claimant desiring to do so. A claimant could achieve that · result by merely withholding the filing of his claim. Even if a claim were filed after the designated period, the claimant could contend justifiably that as to him the six months' period for filing suit is inapplicable, since the commissioner is powerless to reject belated claims. Such an interpretation would serve to encourage inaction and delay on the part of claimants. It would mean that the estate could be whittled away by successive suits to the prejudice of the other creditors. And it might make it impossible for the liquidators to complete the liquidation until the general statutes of limitation had run.

The intention of the Legislature to prohibit the filing of claims after the period designated in the published notice is further shown by the provisions in the same section of the statute, requiring the commissioner in like manner to publish a notice calling up depositors to present their claims for adjustment not later than six months after his taking possession of the corporation, and further providing: "That failure to respond to such notice shall not operate so as to deprive any depositor of the right to share equitably and ratably in the distribution of the assets of the corporation in due course of liquidation." We do not think the Legislature would have embodied that proviso in the statute, if it had not believed that his failure to respond to the published notice might debar a depositor from subsequently asserting his claim.

The fact that the proviso is applicable only to depositors and not to claimants other than depositors is plainly indicative of the legislative intention that the claims of all creditors of a defunct banking institution, save depositors, failing to respond to the published notice should be barred.

Moreover, in order that the administration of the insolvent estate may not be unduly prolonged, the statute further provides for the disposition of all unclaimed and unnoticed balances on deposits and for the discharge of the commissioner and his special agent from any further liability therefor.

This litigation forcibly illustrates the necessity and wisdom for requiring the timely presentation of claims against a defunct banking corporation. The loan from the Reconstruction Finance Corporation was sought and obtained by the

liquidators for the purpose of distributing its avails among the depositors, many of whom are persons of limited means, ill-fitted to bear the loss caused by the bank's collapse. All save two of the claimants were recognized as depositors and placed on the account for their distributive shares of the fund. The filing of their oppositions based on contentions of which he had no previous intimation was wholly unexpected by the Bank Commissioner. The total amount claimed by the opponents is largely in excess of the amount obtained for distribution among the depositors. The effect of their oppositions was to impede, if not defeat, the purpose for which the loan from the Reconstruction Finance Corporation was obtained. Although unsuccessful, nevertheless, they have delayed the distribution of the fund for many months. If, on the other hand, they had been successful, the result would be the distribution of the entire fund among some 90 creditors instead of among some 34,000 depositors of the defunct bank. Thus the purpose for which the loan was obtained has been obstructed, and a situation presented which would not have arisen if the opponents had filed their claims for preference with the Bank Commissioner on or before April 26, 1934.

The entire course of opponents' action is at variance with the dominant purpose of Act No. 300 of 1910, which seeks to provide an expeditious and economical method of liquidating a defunct banking institution. No opportunity was given by opponents to the Bank Commissioner to examine and determine the validity of their claims before subjecting this insol-

vent estate to a lengthy and costly litigation.

 No unfairness will result to the opponents from maintaining the plea in bar. All the opponents received notice by publication to file their claims. The three 'months' period allowed for filing claims and the six months' period allowed for instituting suits afforded them ample time and opportunity to judicially assert their rights, if they so desired.

 The trial judge maintained five oppositions as exhibiting preferential claims under Act No. 63 of 1926, viz.: St. Tammany Parish School District No. 2 for $2,562.50; Police Jury of the parish of Jefferson for $8,645.23; Water District No. 1 of the parish of St. Bernard for $551.25; Police Jury of St. Bernard parish for $202.50; and Bayou Terre-Aux-Bouefs Drainage District for the parish of St. Bernard for $5,747.52. These oppositions were maintained on the authority of the decision of this court in the case of In re Liquidation of Hibernia Bank & Trust Company (Jones County, Intervener), 181 La. 335, 159 So. 576, although the trial judge was not in accord with that decision. Subsequently the Jones County decision was overruled by the decision of this court in the case of In re Hibernia Bank & Trust Company (Pan American Life Insurance Company, Intervener), 185 La. 448, 169 So. 464.

The trial judge also maintained the opposition of Carroll, McCall, Plough & Carroll for $650 as an operating expense entitled to a preference, the claim being for legal services rendered during the

period the defunct banking institution was operating on a restricted basis.

The opponents vigorously assert that the decision in the Jones County Case is correct and that the decision in the Pan American Life Insurance Company Case is incorrect. Per contra, the liquidators just as vigorously assert that the former decision is wrong and that the latter decision is right.

It is not necessary to analyze the arguments submitted in support of those opposing views. They are in the main founded on the opinions rendered by this court in the two cases themselves. An examination of the opinions in those cases will disclose the nature of the respective contentions and the arguments upon which they were submitted and determined. In the Pan American Life Insurance Company Case this court quoted with approval the reasons assigned in writing by the trial judge in this case for his disagreement with the opinion rendered by this court in the Jones County Case. Hence, the decision in the Pan American Life Insurance Company Case might well be considered as the settled law of this case. In any event, that decision is the latest expression of this court as to the nature and extent of the privilege created by Act No. 63 of 1926 and no good reason has been shown by the opponents for departing from the decision. On the contrary, further consideration of the disputed question has satisfied us that the decision in the Pan American Life Insurance Company Case is sound and that it should be adhered to as reflecting the true meaning and purpose of the provisions of Act No. 63 of 1926.

No purpose would be served in discussing the claim of Carroll, McCall, Plough & Carroll. Opponents failed to file their claim with the Bank Commissioner and their failure to do so bars recovery on the claim.

The other five oppositions allowed by the trial judge on the authority of the Jones County Case must be rejected, not only because they were not timely filed with the Bank Commissioner, but also because the Jones County Case was subsequently overruled by the Pan American Life Insurance Company Case.

The defense that no proof of the claim was filed with the Bank Commissioner is not urged against the following claimants, viz.: William H. Hickerson, Jr., and Hugo Ornstein; William H. Hickerson, Jr.; N. V. Nederlandsche Kolonial Hendelvereening; Rouwenhorst Mulder & Co.; Hattiesburg Grocery Company; and State Agricultural Credit Corporation.

William H. Hickerson, Jr., and Hugo Ornstein filed a joint opposition to the liquidators' account, asking that they be recognized as preferred creditors for the sum of $4,783. Hickerson, under the trade-name of Hickerson Importing Company, is a coffee importer, in New Orleans. Ornstein is a coffee exporter, in Brazil. Hickerson agreed to purchase from Ornstein 500 bags of coffee for $4,-783. On December 13, 1932, Hickerson wrote a letter to the Interstate Bank, requesting the bank to open a letter of credit in favor of Ornstein for $4,783 to cover

a ninety-day sight draft to be drawn by Ornstein, which draft was to represent the purchase price of the coffee. The next day the bank opened its irrevocable letter of credit, whereby it promised Ornstein to accept a draft or drafts for any sum or sums not exceeding a total of $4,783 at ninety-day sight, provided the draft or drafts were accompanied by commercial invoices, consular invoices and complete sets of clean negotiable on Board Ocean bills of lading, evidencing shipment of 500 bags of coffee. The letter of credit provided that the draft or drafts would be payable at the National City Bank of New York, if the draft or drafts were negotiated or presented on or before December 17, 1932. Attached to the letter of credit was a letter of engagement signed by Hickerson in the name of the Hickerson Importing Company, in which he agreed to provide the bank at least one day previous to the maturity of any draft drawn pursuant to the letter of credit, sufficient funds with which to meet the draft, together with 1 per cent. commission, and to insure at the risk of the Hickerson Importing Company for the bank's benefit all the merchandise purchased or shipped pursuant to the letter of credit. Hickerson also agreed that title to all the merchandise purchased by means of the letter of credit and in payment for which the draft or drafts were to be drawn, should be and remain in the bank until payment of any and all liability which the bank assumed by accepting the draft or drafts drawn by Ornstein against the bank. On January 3, 1933, Hickerson on a trust receipt withdrew from the

banks the documents representing the coffee. The trust receipt provided that title to the coffee should remain in the bank, the possession of Hickerson being merely that of trustee for the bank, which was to receive the avails thereof. Hickerson sold the coffee and deposited the proceeds of the sale in his general checking account in the Interstate Bank. On February 2, 1933, Hickerson drew his check for $4,804.85 against his deposit and delivered the check to the Interstate Bank, together with a letter setting forth that the check was for the specific purpose of retiring drafts drawn by Ornstein. The $4,804.85 called for by the check represented $4,783, amount of draft, $23.92, banker's commission, .02 check tax and $2.09, rebate for prepayment.

The draft drawn against and accepted by the bank under its letter of credit was payable April 7, 1933. Opponent Hickerson contends that he is a preferred creditor to the extent of $4783, the amount of the draft, by virtue of a trust relationship and equitable lien, or, in the alternative, that Act No. 63 of 1926 gives him a privilege on all the general assets of the bank to secure the amount of the draft. Ornstein contends that he is entitled to the preferential payment of the $4,783, or, in the alternative, he is entitled to a lien under the provisions of Act No. 63 of 1926. There is no dispute in fact between the opponents, who seek a joint judgment in their favor.

The trial judge rejected the contention of opponents that they were entitled to a preference by virtue of a trust relationship

or equitable lien on the authority of Young v. Teutonia Bank & Trust Company, 134 La. 879, 64 So. 806 and Daugherty v. Canal Bank & Trust Company, 180 La. 1003, 158 So. 366, both of which hold in effect that equitable liens do not exist under the laws of this state.

Opponents' contention, in order to bring their claims under the provisions of Act No. 63 of 1926, is that when the check for $4,804.85 was given the bank by Hickerson on February 2, 1933, it was for the purpose of having the bank collect from itself and to remit to the holder of the draft. The trial judge held that opponents could not successfully invoke the provisions of Act No. 63 of 1926 for the following reasons which we quote from his written opinicn, viz.:

"In the first place, the check given the bank by opponent Hickerson was, as I see it, given the bank to pay the liability Hickerson incurred when he signed the Letter of Engagement, under which the letter of credit was opened. Hickerson, in effect, found that he was unable to buy the coffee from Ornstein on his own credit, but was able to buy it against bank credit, so he applied to the bank requesting it to open credit in favor of the foreign exporter, so that the latter would be assured of acceptance of his drafts when presented for acceptance, with bills of lading attached, and be assured also of payment by the drawee upon maturity. This credit was established by Hickerson applying therefor and signing the Letter of Engagement. He merely complied with his requirements in the letter of engagement in paying the bank the money

represented by his check. In no sense was he placing the bank in funds to meet the draft. Those funds were not to be held separate, or in any traceable form for the purpose of meeting the maturing draft that had theretofore been accepted by the bank. Hickerson was doing no more than paying the bank the obligation he incurred when it opened the irrevocable letter of credit and accepted the draft drawn thereon and payable ninety days later. The Bank's liability to the holder of the draft was absolute; and consequently it would have been compelled to pay the draft irrespective of whether or not Hickerson ever paid it the amount thereof. I am aware that it may be argued that Hickerson's obligation under the Letter of Engagement was merely to place the bank in funds one day prior to the maturity of the draft, and he actually made the payment on February 2, 1933, though the draft did not mature until April 7th. The fact of prepayment is unimportant. The important fact is that the delivery of the check was intended upon its clearance to be payment and was therefore not intended to be a collection and remittance or delivery item. Hickerson was satisfying his liability to the bank by the delivery and clearance of the check.

"In support of this same contention, I should point out that under the application to withdraw the shipping invoices and consular documents, and under the trust receipt itself, the title to the 500 bags of coffee was in the Bank, and Hickerson when he sold the coffee was doing nothing more than selling the Bank's

property and obligating himself at the same time to deliver the proceeds to the bank upon the completion of the sales. The Bank never intended to be unprotected in its dealings with Hickerson. It intended to have at all times either title to the coffee or the proceeds of its sale. For that reason, also, I fail to see how opponents can invoke Act No. 63 of 1926, when one who withdraws a document, title to which is in the Bank on a trust receipt, and sells that document and then delivers the proceeds to the Bank by check or other means.

"However, even though I were wrong in the analysis I have here made of the transaction, and the reasons I have advanced for believing that the delivery of the check by Hickerson to the Bank was payment of his obligations under the Letter of Engagement, his application to withdraw documents on trust receipt, and under the trust receipt, I would still refuse to grant him or Ornstein a lien and privilege under Act No. 63 of 1926. I would refuse because in prepaying to the Bank the amount due it under the Letter of Engagement, that is, in paying it on February 2, 1933, instead of one day prior to the maturity of the draft, that is on April 6, 1933, he received a discount or rebate for that prepayment. This discount or rebate is nothing more than prepaid interest. The only reason the Bank would have given him this rebate for his prepaying his obligation under the Letter of Engagement, was because the bank thereby secured the right to use the money so obtained by it by means of his aforesaid check. This pay-

ment of interest, in my opinion, created undoubtedly the relationship of debtor and creditor. It was paid solely and only for the use of the money. Title to the money, therefore, passed to the Bank, and Hickerson, as well as Ornstein, became nothing but a mere ordinary creditor of the Bank entitled to no preference or lien whatsoever."

We think the reasons assigned by the trial judge are sound and that the joint opposition filed by William H. Hickerson, Jr., and Hugo Ornstein was properly rejected.

The opposition of William H. Hickerson, Jr., involves a claim for preferential payment in the sum of $2,408. The facts and legal principles involved are the same as those involved in the joint opposition of Hickerson and Ornstein. The trial judge dismissed Hickerson's opposition for the same reasons he dismissed the joint opposition of Hickerson and Ornstein. We find no error in the judgment.

The oppositions of N. V. Nederlandshe Koloniale Handelvereening and Rouwenhorst Mulder & Co. also grow out of coffee transactions which were handled on letters of credit issued by the Interstate Bank. The opponents and the liquidators entered into a lengthy stipulation of facts in each case, which are incorporated in the opinion of the trial judge. We do not find it necessary to reproduce them here. As found by the trial judge, these oppositions to all intents and purposes present the same questions which are presented in the opposition of Hickerson and Ornstein, except

that in the present oppositions Zander & Co., Inc., which delivered its checks to the Interstate Bank in payment for the coffee, is not asking for a preference or a lien under Act No. 63 of 1926, but it is the holders of the drafts which are doing so. Further, the checks of Zander & Co., Inc., were not drawn on the Interstate Bank, but on the Whitney National Bank, of New Orleans, in which the drawer had a checking account with sufficient funds to take care of the checks without necessarily using the proceeds of the sale of the coffee, nor were the checks when given to the Interstate Bank accompanied by letters of instructions similar to the one which accompanied the check that Hickerson delivered to the bank.

The record discloses that the Interstate Bank was not requested nor directed to hold the proceeds of the checks of Zander & Co., Inc., in cash, or to earmark or set them aside from any of its assets or from the assets of its customers. The proceeds of the checks, when received, were immediately commingled with the funds of the bank and were credited on an account captioned "Customers' Liability under Letters of Credit," which account served for and embraced liability under numerous letters of credit, including those sued on by the opponents, and the cash account of the bank received a corresponding debit.

The trial judge found that the points of difference which we have hereinabove enumerated were not sufficient to lead him to any other conclusion than the one at which he arrived in considering the

Hickerson-Ornstein opposition. "As a matter of fact," says the trial judge in disposing of each opposition, "that conclusion is even strengthened in this case by the fact that the one who delivered the check is not asking for a preference or lien under Act No. 63 of 1926 in this opposition."

Opponents cite two New York cases, viz., Shawmut Corporation v. Bobrick Sales Corporation, 260 N.Y. 499, 184 N.E. 68, and Barclays Bank v. Bank of United States, 236 App.Div. 150, 258 N.Y.S. 317, affirmed in 261 N.Y. 688, 185 N.E. 793. They also cite one Louisiana case, viz., In re Canal Bank & Trust Company's Liquidation (Intervention of Wilcox), 178 La. 575, 152 So. 297. But none of the cited cases is authority for recognizing the preference sought by the opponents.

Opponents suggest that to allow them a privilege under Act No. 63 of 1926 would not necessarily require a repudiation of the decision of this court in the Pan American Life Insurance Company Case. However, they contend that the facts of their case bring them within the doctrine announced in the Jones County Case. They say that if the Jones County Case was correctly decided, which they insist it was, they are just as much entitled to the protection of the statute as was Jones County in that case. They urge that the trial judge was wrong in not so holding. They insist that the decision in the Pan American Life Insurance Company Case is not sound, and that the decision in the Jones County Case is sound. They argue the Jones County Case and not the Pan American Life Insurance Company

243

Case should be followed. Those two decisions as published in the official reports speak for themselves. It suffices for us to say that we affirm the doctrine of the Pan American Life Insurance Company Case as the later and better doctrine. Under that decision, opponents' contention is untenable, conceding that the facts involved in their oppositions are the same as were the facts involved in the Jones County Case.

■ The Hattiesburg Grocery Company, a corporation of Hattiesburg, Miss., on May 1, 1928, issued bonds in the sum of $70,000, with coupons attached, payable at the office of the Interstate Trust & Banking Company, New Orleans, La. The bonds were secured by deed of trust or mortgage on certain property in Hattiesburg. The indenture with which the bonds were identified provided that the Interstate Bank was to be the corporate trustee and that Percy H. Stiges was to be the individual trustee.

Under the indenture the Hattiesburg Grocery Company agreed that commencing May 1, 1929, and monthly thereafter it would deposit with the corporate trustee a certain percentage of the principal of the debt, and that commencing on November 1, 1929, and monthly thereafter it would deposit with the corporate trustee a certain percentage of the amount necessary to meet the interest payments on the debt. The indenture permitted the sale of any of the mortgaged property and the release of the mortgage thereon, upon the substitution therefor of cash and notes, which upon their delivery

244

to the trustees became subject to the mortgage created by the indenture. The agreement provided that the Hattiesburg Grocery Company was to pay the normal federal income tax to the extent of 2 per cent. of the total interest paid by company to the bondholders.

Between May 1, 1932, and March 1, 1933, the sum of $5,013.57 came into the bank's possession by means of checks sent to it by the mortgagor in compliance with the provisions of the indenture obligating the mortgagor to make monthly deposits with the bank for the purpose of meeting principal and interest maturities. From December, 1931, up to December 12, 1932, the sum of $1,512.01 came into the bank's possession as proceeds from the sale of mortgaged property. There also came into the bank's possession $117.89 as the unexpended residue of the 2 per cent. of the total interest sent to the bank by the grocery company for the purpose of paying the normal federal income tax. The moneys remitted by the Hattiesburg Grocery Company to the Interstate Bank which were in the bank's possession at the time it went into liquidation were carried on the books of the bank as follows, viz.: Sinking Fund Account (regular monthly payments) $5,013.57; Special Sinking Fund (proceeds from sale of mortgaged property), $1,512.01; Income Tax (2 per cent.) of the interest due November 1 to May 1 of each year, $117.89, or a total of $6,643.47.

The Hattiesburg Grocery Company, Percy H. Stiges, individual trustee, and the Louisiana Savings Bank & Trust Company, substitute corporate trustee,

filed an opposition to the liquidators' account, claiming a lien and privilege under Act No. 63 of 1926 on the general assets of the defunct Interstate Bank to secure the payment of the aforesaid $6,643.47.

Opponents contend that the Interstate Bank was merely the paying agent and not the depositary of the Hattiesburg Grocery Company and they rely for recovery on the doctrine announced in the case of In re Liquidation of Hibernia Bank & Trust Company (Jones County, Intervener), 181 La. 335, 159 So. 576. Opponents concede that the Jones County Case was overruled by the later case of In re Hibernia Bank & Trust Company (Pan American Life Insurance Company, Intervener), 185 La. 448, 169 So. 464. But opponents insist that the Jones County Case was correctly decided and should be reinstated as the jurisprudence of this state on the interpretation of Act No. 63 of 1926, and that the Pan American Life Insurance Company Case was incorrectly decided and should itself be overruled. We cannot accede to opponents' demand. We adhere to the decision in the Pan American Life Insurance Company Case and regard the doctrine therein announced as being now the settled law of the state. Hence, opponents' claim for a lien and privilege must be denied.

■ The opposition of the State Agricultural Credit Corporation, Inc., is predicated on the following facts and circumstances, viz.: On the afternoon of March 1, 1933, that corporation deposited with the Interstate Bank two checks, aggregating $54,585.21, drawn by the Federal Intermediate Credit Bank on the Hibernia Bank & Trust Company. The deposit was made on the regular form of deposit slip and the deposit was credited on the bank book of the depositor. The deposit was also credited to a checking account carried by the State Agricultural Credit Corporation, Inc., with the Interstate Bank, in which account there was at the time a balance of several thousand dollars. Opponent alleges that the balance now due by the Interstate Bank on its account is $51,855.95, and opponent seeks to be recognized as a preferred creditor of the bank for that amount.

Opponent's claim for a preference is based, first upon its contention that the checks, although delivered to the bank on March 1, 1933, were not in fact and in law collected by the bank until March 3, 1933, when the bank resumed the 100 per cent. status as to deposits made on that day and thereafter; and, secondly, in the alternative, upon the contention that opponent is entitled to a privilege under Act No. 63 of 1926.

Both the Interstate Bank and the Hibernia Bank were members of the New Orleans Clearing House Association. Under the rules of that association the method of dealing with checks was as follows, viz.: Each bank made up a package of checks drawn on each other clearing house bank which it received on a particular day and on the same day delivered the package to the drawee bank, which issued a receipt acknowledging that the package contained checks drawn on it

aggregating in amount the total stated in the receipt. On the next morning at 8 o'clock representatives of the member banks met at the Federal Reserve Bank and cast up the accounts among the member banks based on the tentative receipts of the preceding day, the result reached determining whether a bank was a debtor or a creditor for the day. If a debtor, it paid the amount to the Federal Reserve Bank before a specified hour or was charged with the amount by the Federal Reserve Bank, if it had sufficient funds there. If a creditor, it received a credit slip and credit for the designated amount on the books of the Federal Reserve Bank.

In conformity with that practice, the Interstate Bank at about 4 o'clock on the afternoon of March 1, 1933, delivered to the Hibernia Bank all the checks drawn upon that bank, including the two checks involved in this opposition, which had been received by the Interstate Bank that day. The Interstate Bank also delivered to all the other clearing house banks checks drawn on them and received by the Interstate Bank on March 1, 1933. Promptly at 8 o'clock on the morning of March 2, 1933, in conformity with the rules and regulations of the Clearing House Association, the representatives of its member banks met at the Federal Reserve Bank, at which time they produced the receipts given and received for the checks delivered on March 1, 1933. These receipts were immediately tabulated for the purpose of ascertaining whether the net result of the transactions was a debit balance or a credit balance against or in favor of the respective banks.

As a result of the transactions of March 1, 1933, the Interstate Bank showed checks drawn against the other member banks, totaling $356,561.21, and the other member banks showed checks drawn against the Interstate Bank, totaling $287,494.96. The result of these transactions, that is, the interchange of checks drawn on March 1, 1933, was to leave a credit balance in favor of the Interstate Bank of $69,066.25. Prior to 9 o'clock on the morning of March 2, 1933, the tabulation of the clearings of the previous day was completed, and the clearings settlement receipt showing the credit of $69,056.25 in favor of the Interstate Bank was delivered to that bank and entered upon its books. In conformity with the custom and the standing instructions of the clearing house banks, the Federal Reserve Bank credited the Interstate Bank with the credit of $69,056.-25 resulting from the clearings of the previous day.

On the morning of March 2, 1933, the Hibernia Bank & Trust Company, on which the checks had been drawn, charged the account of the Federal Intermediate Credit Bank, the drawer, with the amount of the checks involved here, the charge being made as of date March 1, 1933. At the same time, both checks were immediately marked paid by the Hibernia Bank as of date of March 1, 1933, the payment stamp being perforated through the checks.

Opponent's contention is founded on its interpretation of rule 21 of the Clearing House Association. That rule which was in effect in March, 1933, reads in part as follows, viz.:

"Rule 21. Return Items. Section 1. Errors in exchanges and claims arising from the return of checks from any cause, except for lack of endorsement, shall be adjusted directly between the Banks by Federal reserve checks, if requested, otherwise by receipt in approved form to be collected through clearings of the following business day, before two o'clock p. m., and on half holidays before twelve o'clock M. * * *"

Opponent argues that the purpose and effect of fixing the delay in which checks may be returned "from any cause" is to suspend the finality of payment of checks concerned in the clearance until the expiration of the time so fixed. Payment is not made in law or in fact until such hour according to opponent.

But our reading of the rule satisfies us that its purpose is to permit only a return of items by the bank on which they are drawn where an error exists in making the exchange or from any other cause. Testimony adduced on the trial of the opposition concerning the meaning and intent of the rule as understood by the representatives of the clearing house banks of New Orleans was to that effect, and, further, that the rule was intended for the convenience of the banks themselves and not for the convenience of their customers.

We agree with the conclusion of the trial judge that opponent's contention that credits to customers' accounts prior to 2 o'clock p. m. on the day following the receipt of checks by a bank on which they were drawn were intended solely as conditional credits is untenable. We further agree with the conclusion of the trial judge that the credits were intended, on the contrary, to be absolute, in the absence of an error in exchange or an error on the part of the banks themselves, from the moment the checks were delivered on the afternoon of the day they were received to the bank on which they were drawn. The construction of the rule contended for by opponent, that no check was to be regarded as paid until 2 o'clock p. m. of the day following its receipt, would mean that the drawee bank could not properly start its posting until that hour, although the evidence in the record shows that all banks started their posting before that time, frequently posting on the night of the day on which the checks were received, or, at the latest, in the early morning hours of the following day. Such construction would place an undue burden on the banks themselves, in that as they are not in a position to discover overdrafts until the posting is completed, if the posting were delayed until 2 o'clock of the day following the receipt of a check it would be too late to make adjustments with the other clearing house banks which had received and forwarded to the drawee banks N. S. F. items. Further, if a check were not to be regarded as paid until 2 o'clock of the day following its receipt, it would necessarily follow that any check received by a bank through the clearings would be subordinated to any check received over the counter by the drawee bank from its own customers before that time.

It is clearly shown by the record that rule 21 of the Clearing House Association was never interpreted by any of the member banks as permitting a bank to return a check merely because the drawer requested of the drawee bank that payment be stopped. A request by the drawer of a check that payment be stopped is not a "cause" contemplated by the rule.

Opponent contends that March 2, 1933, was a holiday, having been proclaimed as such by the Governor. If the Governor were authorized under the law to declare the holiday, which it is not necessary to decide, it is shown by the record that he notified the New Orleans Clearing House Association that he approved their proposed action to suspend payment of demand obligations effective as of 9:30 o'clock a. m., which hour was actually set by the Clearing House Association in order that the clearings might be completed before the holiday became effective. And, as a matter of fact, the clearings were actually completed and the meeting adjourned before 9 o'clock on the morning of March 2, 1933.

Our opinion is that the checks involved in this opposition were delivered to and received by the Interstate Bank as a deposit and not as a mere collection. The deposit was absolute and not conditional and the deposit became effective as of March 1, 1933. And this is so, notwithstanding that the deposit slip as well as the bank book itself contained clauses to the effect that "checks, drafts and other items payable in this city may be charged back to the customer if not finally paid

through the New Orleans Clearing House," of which the Interstate Bank was a member. That question is settled by the recent decision of this court in the case of In re Liquidation of Canal Bank & Trust Company (Intervention of Clark & Company), 181 La. 856, 160 So. 609, 99 A.L.R. 473. There the court showed the distinction between a bank's receiving a check for collection and receiving a check for deposit. And the court held that the depositing of checks without restriction on deposit slips containing provisions to the effect that the bank is acting as agent and reserves the right to charge items back to the depositor passes title to the checks where the amount of the checks is credited to the depositor's account at the time of delivery. In such a case the depositor becomes an ordinary creditor, not a privileged creditor, of the bank for the amount of the checks deposited. See, also, the case of In re Liquidation of Hibernia Bank & Trust Company (Intervention of Progressive Investment Company, Inc.), 182 La. 856, 162 So. 644.

Opponent cannot recover under its contention that it is entitled to a preference because the checks were not collected in fact and in law until March 3, 1933. Both facts and law show that the checks were collected and actually deposited to opponent's credit on March 1, 1933, and not on March 3, 1933. Nor can opponent recover under its alternative contention that it is entitled to a privilege under the provisions of Act No. 63 of 1926. No agency existed to collect the checks. They were delivered to and received by

the Interstate Bank for deposit and not as opponent's agent for collection and remittance.

▇▇▇ Robert W. Elsasser and Charles B. Stewart, who filed an opposition which was dismissed by the trial judge, filed with the Bank Commissioner within the designated period what they termed a proof of claim. But they claimed no preference and demanded no protection under Act No. 63 of 1926, hence, we think the claim for a preference or a lien set up in their opposition brings them squarely within the statutory limitation pleaded by the liquidators in bar of their action. For that reason as well as the reasons assigned by the trial judge, their opposition was properly dismissed.

Our conclusion, briefly stated, is that the oppositions to the liquidators' account present four legal propositions which are determinative of the opponents' right to be paid by preference because of the alleged paramount rank of their claims or because of the alleged lien securing their claims. The first is as to the effect of the limitation provisions of Act No. 300 of 1910. The second is as to the claim for an equitable lien or privilege. The third is whether Act No. 63 of 1926 grants any protection in what is commonly known in banking circles as a "paying agent" relationship. And the fourth is whether a lien or privilege exists under the provisions of Act No. 63 of 1926 where the defunct bank was acting as trustee under collateral trust agreements, mortgage, bond, and other security issues.

The limitation provisions of Act No. 300 of 1910 require the dismissal of the oppositions to which the provisions are applicable under the plea in bar filed by the liquidators. The nonrecognition of equitable liens or privileges in this state, as shown by the decision in Daugherty v. Canal Bank & Trust Company, 180 La. 1003, 158 So. 366, requires the dismissal of the oppositions founded upon that proposition. The nonapplication of Act No. 63 of 1926 to a "paying agent" case, as settled by the decision in the case of In re Hibernia Bank & Trust Company (Pan American Life Insurance Company, Intervener), 185 La. 448, 169 So. 464, requires the dismissal of the oppositions claiming a lien under the statute in such cases. And the nonexistence under Act No. 63 of 1926 of any lien in a case where the defunct bank was made the trustee in a security issue, as also settled in the Pan American Life Insurance Company Case, requires the dismissal of the oppositions based on that contention. The opposition of the State Agricultural Credit Corporation is controlled, in addition, by the decision in the case of In re Liquidation of Canal Bank & Trust Company (Intervention of Clark & Company), 181 La. 856, 160 So. 609, 99 A.L.R. 473, as we have hereinabove shown. Therefore, all the oppositions herein filed to the liquidators' account must be dismissed.

Predicating their action upon the accounts of the respective claimants as reflected on the books of the defunct bank, the liquidators have recognized all the claimants as depositors, except Carroll,

McCall, Plough & Carroll and the Avenue Realty Company, and have placed them as such upon their account. Neither the claim of Carroll, McCall, Plough & Carroll nor the claim of the Avenue Realty Company can be considered as a deposit or in the nature of a deposit. Therefore, all the claimants who are entitled to do so will share equally and ratably with the other depositors in the proposed distribution of funds and in any other distribution of funds made to the depositors.

For the reasons assigned, the judgment appealed from is annulled so far as it maintains the oppositions of Carroll, McCall, Plough & Carroll, St. Tammany Parish School District No. 2, Police Jury of the parish of Jefferson, Water District No. 1 of the parish of St. Bernard; Police Jury of the parish of St. Bernard, and Bayou Terre-Aux-Boeufs Drainage District for the parish of St. Bernard, and it is now ordered that those oppositions, and each and every one of · them, be and they are hereby dismissed. It is further ordered that in all other respects the judgment appealed from be and it is hereby affirmed.

ODOM, J., concurs in the decree.

O'NIELL, C. J., concurs in the ruling of Judge Cage, that the claimants, other than depositors, who failed to file their claims on or before the 26th day of April, 1934, did not lose their claims, by effect of the provisions of section 4 of Act No. 300 of 1910; and the Chief Justice dissents from that part of the prevailing opinion in this case which repudiates the doctrine of the Jones County Case, and will assign written reasons therefor.

O'NIELL, Chief Justice (dissenting).

Two propositions are laid down in the prevailing opinion in this case. One of the propositions is that the fourth section of Act No. 300 of 1910, by necessary implication, means that, if a creditor of a bank in liquidation, other than a depositor, fails or neglects, for any reason, to file his claim with the Bank Commissioner and submit proof of the justness of his claim within the limit of time given by the commissioner in the notice which he shall publish, calling upon all claimants other than depositors' to file their claims with the commissioner and "make legal proof as to the justice thereof," the creditor's claim is thereby forfeited, and he is forever barred from asserting the claim, even in a court of justice. The other proposition—or pronouncement—laid down in the prevailing opinion in this case is that the almost unanimous decision that was rendered in Re Liquidation of Hibernia Bank & Trust Company (Jones County, Intervener), 181 La. 335, 159 So. 576, 577, is now all wrong, and ought to be declared overruled whenever it is cited.

The members of the court who, in this case, repudiate the doctrine of the Jones County Case have no occasion or necessity, in this case, to overrule the decision in the Jones County Case. I say this advisedly, because the five claims (amounting to $17,709) which Judge Cage held were protected by Act No. 63 of 1926, as interpreted in the Jones·County Case, are

now declared by the majority of the members of the court to be eliminated,—not prescribed, but proscribed—by the failure of the claimants to file their claims within the time allowed by the Bank Commissioner, in the notice which he published, under the provisions of the fourth section of Act No. 300 of 1910. I refer, of course, to the claim of the St. Tammany Parish School District No. 2, for $2,562.-50; the claim of the Police Jury of Jefferson parish, for $8,645.23; the claim of Water District No. 1 of St. Bernard parish, for $551.25; the claim of the Police Jury of St. Bernard parish, for $202.-50; and the claim of the Bayou Terre-aux-Boeuf Drainage District, for $5,747.52. These five claims, amounting to $17,709, are the only claims that Judge Cage found were entitled to the lien granted by Act No. 63 of 1926; and they are the only claims, besides the claim of Carroll, McCall, Plough & Carroll, for $650, that Judge Cage ordered paid by preference. These six claims are all eliminated by the prevailing opinion of this court, declaring a forfeiture, under the fourth section of Act No. 300 of 1910.

There were, altogether, 98 opponents of the liquidator's provisional account. The opponents claimed to be creditors of the bank, other than depositors. And each opponent claimed a lien or preference because of the nature of his claim. Two of the 98 opponents withdrew or dismissed their claims voluntarily. The claim of another opponent was withheld from submission, by consent of counsel. That left 95 claims in dispute, for Judge Cage to pass upon. The liquidator filed what he called a plea in bar against 89 of the 95 claims in dispute,—the plea being founded upon the fact that the 89 claimants failed to file their claims with the commissioner and "make legal proof as to the justice thereof" before the expiration of the last day of the three months' publication of the notice, given by the Bank Commissioner, under the provisions of the fourth section of Act No. 300 of 1910. Judge Cage overruled the so-called plea in bar—which he preferred to call a plea of prescription—and he then took up and considered separately each one of the 95 claims, on its merits. Judge Cage sustained only the 6 claims that I have mentioned, namely, the five claims amounting to $17,709, which the judge considered protected by Act No. 63 of 1926, as construed in the Jones County Case, and the claim of Carroll, McCall, Plough & Carroll, for professional services, amounting to $650. It so happens, though, that the 6 claims which Judge Cage sustained are among the 89 claims that were not filed with the Bank Commissioner before the last day of the weekly three-months' publication of his call upon all claimants other than depositors to come forward and make proof of their claims. For that reason these six claims are eliminated. I will take up that subject later.

Among the 89 claimants whose claims were rejected by Judge Cage are 5 (listed as 6) who filed their claims with the bank commissioner in time to escape the so-called plea in bar. They are (1) William H. Hickerson, Jr., and Hugo Ornstein; (2) William H. Hickerson, Jr.; (3) N. V. Nederlandsche Koloniale Hendel-

vereening; (4) Rouwenhorst Muller & Co.; (5) Hattiesburg Grocery Company; and (6) State Agricultural Credit Corporation. None of these claims is protected by Act No. 63 of 1926, as construed in the Jones County Case. It was so held by Judge Cage, and it so appears and is not disputed in the prevailing opinion of this court. Hence there is no necessity or occasion, in denying that these claims are secured by a lien, to overrule the decision rendered in the Jones County Case.

There is no suggestion in the prevailing opinion in this case that any particular error, inadvertence, or oversight was committed in construing Act No. 63 of 1926 in the Jones County Case. There was a vacancy and hence there were only six justices on the bench when the case was decided. Only one justice dissented. He wrote a dissenting opinion, covering nearly eleven pages, and covering every point in the case. But no other justice dissented then or when the petition for a rehearing was denied—two months and nine days after this court first rendered its decision in the case—affirming the judgment of Judge Gleason, of the civil district court.

The facts in the Jones County Case conformed accurately with the conditions required by Act No. 63 of 1926 for allowing a lien on the assets of an insolvent bank. The purpose of the statute is to prevent the injustice of allowing other people's money, held by a bank only temporarily and as an agent, to be distributed among the creditors of the bank in case of its being insolvent. The first section of the statute declares:

"That when any bank receives as agent (whether as agent of another bank or of any person, firm or corporation) for collection and remittance or delivery to its principal and not for deposit any bill, note, check, order, draft, bond, receipt, bill of lading, or other evidence of indebtedness, or other instrument, and collects or realizes any money on the same, and has not deposited same to the credit of said principal, the principal shall have a privilege [lien] on all of the property and assets of said agent bank for the amount so collected or realized by said agent bank, which privilege [lien] shall be superior to the claims of all depositors of said agent bank, the claims of all creditors of said agent bank having no privilege [lien] and to all other general privileges [liens] on the property and assets of said agent bank, except those for law and judicial charges."

The conditions—and the only conditions—on which the statute confers the lien or preference are, first, that the bill, note, check, order, draft, bond, receipt, bill of lading, or other evidence of indebtedness, or other instrument, shall be received for collection by the bank *as agent* for the owner of the instrument; second, that the intention of the parties shall be that the money to be collected by the bank as agent *is to be remitted or delivered to the principal, and is not to be deposited to his credit in the bank so as to convert the relation of the bank, as agent, into that of an ordinary debtor,* of the party who sent the instrument to the bank; and, finally, third, that the bank, in fact, "has not deposited same [meaning the proceeds

of the instrument] *to the credit of the principal."* (I did the italicizing.)

In the Jones County Case the supervisors of Jones County, Miss., sent, through the Commercial National Bank & Trust Company, in Laurel, Miss., to the Hibernia Bank & Trust Company, in New Orleans, a check for $7,932.30, drawn on the Whitney National Bank, in New Orleans. The instruction in the letter accompanying the check was that with the proceeds of the check the Hibernia Bank should pay certain bonds of Jones County, and certain coupons, all payable at the Hibernia Bank, on the sixth day after the bank received the check. The Hibernia Bank collected the check on the Whitney Bank, and, of course, did not deposit the proceeds to the credit of Jones County, or to the credit of the Commercial National Bank & Trust Company in Laurel, Miss., but, as a necessary bookkeeping entry, to keep a record of the money which the Hibernia Bank held as agent for Jones County, Miss., the bank set up on its books an account headed "Jones County Bonds Payment Account," to which the amount to be paid to the bondholders was credited; and the bank set up another account, headed "Jones County 6% Road Bond Coupon Account," to which the amount to be paid to the holders of the coupons was credited. Neither Jones County nor the Commercial National Bank & Trust Company in Laurel, Miss., ever had an account or a deposit in the Hibernia Bank. The bank failed and went into liquidation while holding Jones County's money in its possession as agent. Of course, the bank had not kept Jones County's money separate from the bank's funds, as in a couple of sacks. Banks never do business that way. If they did there would be no need for a statute like Act No. 63 of 1926. It was so observed in Tropical Printing Co. v. Union Title Guaranty Co., 180 La. 702, 157 So. 534.

The only points in the Jones County Case on which it was argued—or could have been argued—that the facts of the case did not conform with the requirements of the act of 1926 were, first, that the money which the Hibernia Bank received as agent was in fact *deposited* in the Hibernia Bank; and, second, that the check was received by the Hibernia Bank not merely for collection and remittance or delivery to the principal, but primarily for the purpose of paying Jones County's bonds and coupons which were about to come due. Our answer to the first argument was that the money was not deposited "to the credit of the principal." The reason why there is no lien if the money is deposited by the agent bank to the credit of the principal is that such a deposit, if made with the principal's approval, makes him an ordinary creditor of the bank. Our answer to the second argument was that a payment, or "remittance or delivery," to the order of the principal, or to a person or persons designated by the principal, was in reality a payment or "remittance or delivery" to the principal; and that, even though the primary purpose of sending the check to the Hibernia Bank was to pay the bonds and coupons that were about to come due, nevertheless the check was received by

the Hibernia Bank as agent, "for collection and remittance or delivery," and therefore, Jones County's Case fulfilled every condition that the statute required for the protection of the money with which the Hibernia Bank was intrusted as Jones County's agent.

To show that the opinion which we rendered in the Jones County Case answered every argument that was or could be made—and to show that we did not extend the terms of the statute beyond its necessary implications—I quote from the opinion the most pertinent paragraphs, viz.:

"Before the act of 1926 came into effect, one who sent a negotiable [commercial] instrument to a bank merely for collection and remittance or delivery, and not for deposit, had no protection against the bank's becoming insolvent and failing to remit or deliver the proceeds so collected. The Legislature, evidently, deemed it unjust that one whose money was collected by a bank as his agent, and who had not consented to become a depositor in the bank, should suffer the loss of his money by its distribution among the depositors, or ordinary creditors of the bank, if the bank should become insolvent. The Legislature, therefore, drew the distinction between the fiduciary relation of principal and agent, and the relation of depositor and depositary, which is the relation merely of the ordinary creditor and debtor.

"It is contended by the appellants that Jones county, Miss., is not entitled to the lien provided for by the act of 1926, because the proceeds of the check on the Whitney National Bank were in fact deposited by the Hibernia Bank & Trust Company in its bank. The proceeds of the check were deposited by the Hibernia Bank & Trust Company, but not to the credit of Jones county, Miss. The proceeds were deposited to the credit of the two special accounts which were set up on the books of the Hibernia Bank & Trust Company, as a necessary bookkeeping entry, to have an account [a record] of the funds. The act of 1926 requires, as a condition on which the lien is granted, that the bank that has collected the money as agent 'has not deposited same to the credit of said principal.' The money, in this instance, was not deposited to the credit of the principal, Jones county, Miss. * * *

"It is argued, finally, for the appellants, that the act of 1926 was not intended to apply to a case like this, where the instrument was sent to the bank not merely for collection and remittance or delivery to the sender, but for the purpose of paying an obligation of the sender. It is true that the main purpose of sending to the Hibernia Bank & Trust Company the check on the Whitney National Bank was not merely to collect the check, but to pay the bonds and coupons which were payable at the Hibernia Bank. That means that the authority of the Hibernia Bank & Trust Company, as agent for Jones county, Miss., extended further than to collect the check. But the agency or mandate included the authority and duty to collect the check; and the fact that the mandate went further, and in-

cluded also the authority and duty to remit or deliver the proceeds to the bondholders, does not take the case out of the provisions of the statute."

The Bank Commissioner and his department, and the banks and bankers and their attorneys, throughout the state, were, apparently, convinced of the soundness of the decision in the Jones County Case; otherwise, they would have proposed an amendment of the law, in one of the many sessions of the Legislature that were held during the period in which the decision in the Jones County Case was the latest decision on this important subject. The state banking department was then and is yet in harmony with the state administration, and could and would have had the Legislature to make a change in the law, as interpreted by this court in the Jones County Case, if the banking department had believed that our interpretation of the statute was wrong. The Jones County Case was decided by Judge Gleason, in the civil district court, on June 12, 1934. The judgment was affirmed by this court on November 26, 1934; and the petition for a rehearing was denied on February 4, 1935. The case of the Pan American Life Insurance Company, which was an intervention in the same liquidation proceeding, In re Hibernia Bank & Trust Company, 185 La. 448, 169 So. 464, was decided by Judge Gleason on July 9, 1935; and his decision was reversed by this court on May 8, 1936; and the petition for a rehearing was denied on June 30, 1936. It was in that case that this court, by the scant majority of 1 vote, declared that the de-

cision which had been rendered in Jones County's Intervention in the same liquidation proceeding was unsound, and that it was the duty of the court to overrule it. Meanwhile, that is, while the decision in the Jones County Case was the last word on the subject, the Legislature held nine sessions, in any one of which the State Bank Commissioner might have had the law changed if he had believed that the doctrine of the Jones County Case was unsound. The Legislature was convened in regular session on May 14 and adjourned on July 12, 1934. It was convened in its first extra session of 1934 on August 14 and adjourned on August 18. It was convened in its second extra session of 1934 on November 12 and adjourned on November 16. It was convened in its third extra session of 1934 on December 16 and adjourned on December 20. It was convened in its first extra session of 1935 on February 26 and adjourned on March 2. It was convened in its second extra session of 1935 on April 15 and adjourned on April 20. It was convened in its third extra session of 1935 on July 4 and adjourned on July 8. It was convened in its fourth extra session of 1935 on September 7 and adjourned on September 11. And it was convened in regular session on May 11 and adjourned on July 8, 1936. In none of these sessions, as far as I know, was there any suggestion that the judicial interpretation of the act of 1926 in the Jones County Case was not what the Legislature and the state banking department intended it should be.

During the period of these sessions of the Legislature the state banking depart-

ment was aware that Jones county, Miss., had sued the Interstate Trust & Banking Company, on August 21, 1933, for $4,135.94, being the proceeds of a check on another bank, sent by Jones County to the Interstate Trust & Banking Company, for the purpose of paying certain bonds and coupons, exactly as in Jones County's Case against the Hibernia Bank & Trust Company in liquidation. In fact the letter accompanying the check that was sent to the Interstate Bank bore the same date as the letter accompanying the check that was sent to the Hibernia Bank, and the bonds and coupons were due at each bank on the same date. In the suit against the Interstate Trust & Banking Company, Jones County claimed an equitable lien or, in the alternative, the lien granted by Act No. 63 of 1926. The bank's defense was that the money had been deposited to the credit of Jones County and mingled with the bank's funds, and hence that Jones County had no lien on the assets of the bank. After the case was submitted on its merits in the District Court of the United States for the Eastern District of Louisiana, the bank was taken over by the bank commissioner, in this liquidation proceeding which we are now considering; and the Bank Commissioner and his special agent and the liquidator were made parties to the suit in the United States District Court. Judge Borah gave judgment in favor of Jones County for the $4,135.94, with recognition of the lien granted by Act No. 63 of 1926. The decree was affirmed by the Circuit Court of Appeals, Fifth Circuit, on May 22, 1935, following the decision

which then had been rendered by the Supreme Court of Louisiana, in Re Liquidation of Hibernia Bank & Trust Company (Intervention of Jones County), 181 La. 335, 159 So. 576. See Interstate Trust & Banking Co. v. Jones County, Miss. (C.C.A.) 77 F.(2d) 806. The Supreme Court of the United States refused a writ of certiorari. 296 U.S. 608, 56 S.Ct. 124, 80 L.Ed. 431. The second paragraph of the headnotes, 77 F.(2d) 806, states the case, thus:

"Where bank receiving county's check for payment of bonds and coupons due at bank collected check but failed before paying any bonds or coupons, county *held* entitled to statutory lien on bank's assets for proceeds of check (Act La. No. 63 of 1926)."

Judge Cage's criticism—in the opinion which he rendered in the present case—of the decision which was rendered by this court in favor of Jones County, Miss., as intervener in the Liquidation of the Hibernia Bank & Trust Company—was adopted virtually as the majority opinion in the decision rendered against the Pan American Life Insurance Company, as intervener in the same liquidation proceeding—In re Hibernia Bank & Trust Company (Pan American Life Insurance Company, Intervener), 185 La. 448, 169 So. 464, 466. Hence it is said in the prevailing opinion (ante, p. 233, 176 So. 8) in this case:

"In the Pan American Life Insurance Company Case this court quoted with approval the reasons assigned in writing by the trial judge in this case for his

disagreement with the opinion rendered by this court in the Jones County Case. Hence, the decision in the Pan American Life Insurance Company Case might well be considered as the settled law of this case."

This case is the Liquidation of the Interstate Trust & Banking Company. The decision that was rendered against the Pan American Life Insurance Company, as intervener, was rendered in the Liquidation of the Hibernia Bank & Trust Company. So was the decision in favor of Jones County, as intervener, rendered in the Liquidation of the Hibernia Bank & Trust Company. That decision, surely, was the law of that case; and it was respectfully followed by the trial judge in deciding this case, in spite of his own opinion.

There was no necessity or occasion for declaring, in disposing of the Pan American Life Insurance Company's Intervention, that the decision which had been rendered in favor of Jones County, as intervener in the same proceeding, ought to be overruled. The attorneys for the Bank Commissioner and his special agent and the liquidator of the Hibernia Bank & Trust Company, in their original brief in the matter of the Intervention of the Pan American Life Insurance Company, did not contend that the decision which had been rendered by this court in favor of Jones County, Miss., was wrong, or ought to be overruled. On the contrary, their only contention or argument, on that subject, in their original brief, was that the decision in the Jones County Case had no application to the Pan American Life Insurance Company's Case. On the third page of the brief they said: "Counsel for intervener [Pan American Life Insurance Company] rely on the decision in the Jones County Case. We submit that the Jones County decision has no application to the case at bar." And in the concluding paragraph on the last page of the brief they repeated: "We respectfully submit, therefore, that the Jones County Case has absolutely no application to the case at bar." The brief was filed two days before Judge Cage signed the judgment in the present case, and only two days after it was rendered. A month afterwards the attorneys for the Bank Commissioner and his special agent and the liquidator of the Hibernia Bank & Trust Company, filed a supplemental brief, in the matter of the Pan American Life Insurance Company's Intervention, and adopted, substantially, that part of Judge Cage's opinion in the present case, in which he criticized the decision which we had rendered in the matter of the Jones County Intervention.

In the prevailing opinion rendered against the Pan American Life Insurance Company, as intervener in the Liquidation of the Hibernia Bank & Trust Company, the four justices who subscribed to the opinion did not declare or find that it was necessary to overrule the decision that had been rendered in favor of Jones County, Miss., to decide against the Pan American Life Insurance Company. On the contrary, they pretermitted that question and said:

"The intervener [Pan American Life Insurance Company] admits that it did

not place its bonds and coupons with the Hibernia Bank & Trust Company, as agent for collection, remittance, or delivery, but presented them solely and only for payment. It contends that under the terms of the indenture agreement, since payment to the corporate trustee discharged the hotel company as mortgage debtor, the bondholders are legally subrogated to all of the rights of the hotel company; and that, as the Hotel Company placed the notes and New Orleans exchange with the Hibernia Bank & Trust Company for collection, remittance, or delivery, and not for deposit, but for payment to the hotel company's order, as principal, under the provisions of Act No. 63 of 1926, as interpreted by this court in Re Liquidation of Hibernia Bank & Trust Company (Jones County, Intervener), 181 La. 335, 159 So. 576, intervener is entitled to a lien and privilege on all of the bank's assets.

"Conceding that the bond and coupon holders and owners are legally subrogated to the hotel company's rights, a view most favorable to the intervener, *but without deciding that issue* we shall pass to a consideration of whether or not the construction placed by this court upon the statute in the Jones County Case is sound. The intervener asserts that it is correct and the liquidators contend manifest error has been committed and gross injustice to innocent depositors has been done and will continue to be done to them by adhering to and following that case. At the time that decision was rendered there were six justices on the bench, one having died. The opinion was by a divided

court and is the only decision in point by this court with reference to this question. Some time later, in two articles in the *Tulane Law Review,* the authors criticised the majority view and agreed with the dissenting opinion." (I supplied the italics.)

Here the author of the 4-to-2 opinion in the Pan American Life Insurance Company's Case, who was the author of the dissenting opinion in the Jones County Case, quoted, at length, the criticism of the prevailing opinion in that case, which Judge Cage had indulged in, in his opinion in the present case. Then it was said, in the 4-to-2 opinion in the Pan American Life Insurance Company's Case, after a repetition, substantially, of what was said in the dissenting opinion in the Jones County Case:

"In view of the error into which we have fallen in interpreting Act No. 63 of 1926, in the case entitled In re Liquidation of Hibernia Bank & Trust Co. (Jones County, Intervener), 181 La. 335, 159 So. 576, and the injustice it does to innocent depositors, who are treated as ordinary creditors on a pro rata basis, we are of the opinion that it is our duty to overrule that decision."

The pronoun "we," in the reference to "the error into which we have fallen," included only two members of the court, as it was then constituted. The author of the prevailing opinion in the Pan American Life Insurance Company's Case had no error to confess, because he alone dissented from the prevailing opinion in the Jones County Case. The then newly

elected member of the court, who was one of the four subscribers to the prevailing opinion in the Pan American Life Insurance Company's Case, was not responsible for the so-called error into which the two other subscribers to the prevailing opinion in the Pan American Life Insurance Company's Case confessed they had fallen into in the Jones County Case. Inasmuch as these two subscribers to the 4-to-2 decision in the Pan American Life Insurance Company's Case subscribed also to the 5-to-1 decision in the Jones County Case, I respectfully submit that the latter decision is a better guide than the 4-to-2 decision in the Pan American Life Insurance Company's Case. The reason why that decision was a 4-to-2 decision is that I was absent from the state when it was rendered; otherwise it would have been a 4-to-3 decision. The two other justices who had subscribed to the 5-to-1 decision in the Jones County Case, in dissenting from the 4-to-2 decision in the Pan American Life Insurance Company's Case, published as their reason for dissenting that they were "of the opinion that the court should adhere to the interpretation which it placed on Act No. 63 of 1926 in the case of In re Liquidation of Hibernia Bank & Trust Co. (Jones County, Intervener), 181 La. 335, 159 So. 576, and, on the authority of that case, affirm the judgment." Of the two justices who subscribed to both the 5-to-1 decision in the Jones County Case and the 4-to-2 decision in the Pan American Life Insurance Company's Case, one has retired from the bench. Taking all of these matters into consideration, I respectfully submit that the 5-to-1 decision that was rendered in favor of Jones County, Miss., as an intervener in the Liquidation of the Hibernia Bank & Trust Company, is better authority than the 4-to-2 decision that was rendered against the Pan American Life Insurance Company, as an intervener in the same liquidation proceeding.

I do not regard the decision that was rendered in favor of Jones County, Miss., as having been overruled by the decision that was rendered against the Pan American Life Insurance Company, as an intervener in the same liquidation proceeding. A court cannot overrule one of its own decisions without first deciding that the decision, if not overruled, would be in conflict with the decision about to be rendered. For a court to overrule one of its own decisions without first deciding that it is necessary to overrule it, would be like declaring a statute unconstitutional without first deciding that the statute is applicable to the case in hand. In the Pan American Life Insurance Company's Case, the four members of the court who subscribed to the prevailing opinion did not decide that the decision in the Jones County Case was applicable to the case in hand, but, without deciding that issue, said: "we shall pass to a consideration of whether or not the construction placed by this court upon the statute in the Jones County Case is sound." And, having duly considered the question of soundness of the decision in the Jones County Case, the four justices came to the conclusion, "that it is our duty to

overrule that decision." That expression is referred to by the lawyers in their briefs in this case as obiter dictum. The same may be said of the repudiation of the doctrine of the Jones County Case in the prevailing opinion in the present case, because, as I have pointed out, there is no necessity or occasion in this case to overrule the decision in the Jones County Case.

There never has been a decision by this court in conflict with the decision rendered in the Jones County Case. The members of the bar will observe hereafter that even the decision in the present case is not in conflict with the decision rendered in the Jones County Case. The decision in that case was supported by the decision in S. E. Hall, Inc., v. Farmers' Trust & Savings Bank, 177 La. 659, 148 So. 909, decided in May, 1933; and it was in accord with Joffrion-Woods, Inc., v. Brock, State Bank Commissioner, 180 La. 771, 157 So. 589; and Vivian State Bank v. Satterwhite, 180 La. 856, 857, 157 So. 788. In the latter case, two promissory notes, one for $5,646.67 and the other for $2,448, were brought from the bank on March 7, 1930, and on the same day were left by the purchaser with the bank "for 'safekeeping and collection.'" The notes were collected by the bank on May 29, 1930, and January 29, 1931, respectively. The proceeds were not deposited to the credit of the owner of the notes, and she did not know that they had been collected until the bank went into liquidation. Notwithstanding the main purpose of leaving the notes with the bank was for

safe keeping, the court allowed the lien under Act No. 63 of 1926, because the purpose of leaving the notes in the bank was to collect them, eventually, and to remit or deliver the proceeds to the owner. That was not as plain a case for the application of the act of 1926 as the Jones County Case was.

Of course, if the Jones County Case was decided wrong, the error committed by the five members of the court has cost the innocent depositors of the Hibernia Bank & Trust Company $7,932.-30; and, if, for the same reason, the federal courts were wrong in the way they decided their Jones County Case, their error has cost the innocent depositors of the Interstate Trust & Banking Company $4,135.94. Those judgments, in favor of Jones County, have become final, and I assume that they have been paid. But it is puzzling to imagine how our refusal—and the federal courts' refusal—to distribute among the depositors in these banks money which the innocent supervisors of Jones County intrusted to these banks as their agents, for collection and delivery to their bondholders, and not for deposit, was an injustice to the innocent depositors. Depositors in a bank have no right to expect that, in the event of the bank's becoming insolvent, they may share in other people's money, intrusted to the bank as agent, for collection and remittance or delivery, and not for deposit.

It is argued on behalf of the liquidator, and hence on behalf of the deposi-

tors, that section 1 of Act No. 63 of 1926 is applicable only to what are called "cash items", meaning checks or drafts received by a bank for collection and remittance of the proceeds to the sender, and not to cases where the proceeds are to be paid to a third party named by the sender of the instrument. That idea is dispelled by the fact that the first section of the statute is not confined to the commercial instruments that are referred to ordinarily as cash items, such as checks and drafts, but extends the protection of the statute to all kinds of instruments, viz.: "any bill, note, check, order, draft, bond, receipt, bill of lading, or other evidence of indebtedness, or other instrument." To show that these terms were not employed indifferently in the first section of the statute, the only instrument mentioned in the second section, which does apply only to cash items, is "a check or draft." The expression "remittance or delivery," instead of the word "remittance," also has its significance. How can a bank *deliver* the proceeds of an instrument to the party who sent the instrument from another city, except by *remittance?* Hence I say that *delivery* means delivery either to the owner of the instrument or to any one to whom he directs the proceeds to be delivered.

In the opinion rendered in the Pan American Life Insurance Company's .Case, 185 La. 448, 456, 169 So. 464, at page 467, it is said:

"Some time later [meaning some time after the Jones County Case was decided], in two articles in the Tulane Law Re-

view, the authors criticised the majority view and agreed with the dissenting opinion."

It is a mistake to say that *the authors of two articles* in the Tulane Law Review criticized the majority view and agreed with the dissenting opinion in the Jones County Case. It was in only one article in the Tulane Law Review that the decision in the Jones County Case was, in·a way, criticized. The article is published in vol. IX, No. 2, p. 301. It was written by one of the student editors. He criticized the decision in Hall v. Farmers' Bank, 177 La. 659, 148 So. 909, and the decision by the Court of Appeal in Re Canal Bank & Trust Co. (Intervention of Palmer), 154 So. 498. But it seems that his criticism of the decision in the Jones County Case was founded upon his understanding that the proceeds of the check which the·Hibernia Bank collected for Jones County were, as he said, "unconditionally credited to Jones County by the bank." Hence he said:

"The present decision [meaning the decision in the Jones County Case] is based principally upon Hall v. Farmers' Bank, supra. Conceding the authority of that case, the court might well have concluded that, *since the proceeds of the check had been collected and unconditionally credited to Jones County by the bank, which was not contrary to instructions and was in accord with their previous dealings,* no privilege should be conferred upon Jones County, even though the bank had·the duty of disbursing the proceeds in a particular way. No distinction

should be made as to the creditor's rights, whether the irregular deposit is made for the primary purpose of establishing credit or in a special account for a special purpose. Matthews, Finley & Co. v. Their Creditors, (1855) 10 La.Ann. 342; In re Louisiana Savings Bank (1888) 40 La. Ann. 514, 4 So. 301."

As I have pointed out, and as the record in the Jones County Case shows, the proceeds of the check collected by the · Hibernia Bank were not ·"unconditionally credited to Jones County by the bank." The proceeds of the check were held by the bank under two bookkeeping entries, which were set up, necessarily, to have a record of the funds, "in accord with their previous dealings" with Jones County, Miss. The supervisors of Jones County knew, from their previous dealings with the Hibernia Bank, that the proceeds of the check· would not be deposited to the credit of Jones County, but would be delivered to the bondholders, as directed in the letter accompanying the check. And, from their previous dealings, the supervisors of Jones County knew that the proceeds of the check would not be kept by the bank in two envelopes, or two bags, labeled, respectively, "Jones County Bonds Payment Money," and "Jones County ·6% Road Bond Coupon Money," but ·would be mingled with the funds of the Hibernia Bank; and that a record, in the form of a bookkeeping entry, would be kept of both the fund to be paid to the bondholders and the fund to be paid to the coupon holders; hence the supervisors knew, from their previous dealings with the bank, if

they knew the law of Louisiana on the subject, that their money which they had intrusted to the bank as their agent would be protected by Act No. 63 of 1926.

. Judge Cage, in his opinion in this case, which opinion, is published at length as the basis for the 4-to-2 opinion in the Pan American Life Insurance Company Case, 185 La. 448, at page 457, 169 So. 464, at page 467, said, en passant, that his conviction, concerning the decision in the Jones County Case, was substantiated by the criticism of the case in IX Tulane Law Review, 301; but the judge added: "See also IX Tulane Law Review, 416–628." Perhaps that is what brought forth the statement in the prevailing opinion in the Pan American Life Insurance Company Case that there were two articles in the Tulane Law Review criticizing the majority view and agreeing· with the dissenting opinion in the Jones County Case. An examination of the pages from 416 to 628 of IX Tulane Law Review fails to disclose any criticism of the Jones County Case, though it is cited on page 469.

Judge Cage's criticism of the decision in the Jones County Case was based mainly upon hypothetical and imaginary cases, or examples which the judge gave, and which he said seemed to him "to demonstrate that the Legislature never intended such absurdity." For example, the judge said that, if Jones County had drawn the $7,932.30 in coin or currency, from the bank in Laurel, Miss., and had sent the coin or currency to the Hibernia Bank, by express or by mail, or by Jones County's "own private messenger," with

instructions to the bank to hand the coin or currency over to the bondholders, Jones County's coin or currency would not have been protected by a lien under Act No. 63 of 1926. Of course not. The members of the Legislature of 1926 knew that business men did not remit money—especially large sums of money—in coin or currency. Hence the Legislature did not make provision for such a case, in Act No. 63 of 1926. But, if the board of supervisors of Jones County had done such an extraordinary thing as to ship $7,932.30 in coin, or in currency and coin, to the Hibernia Bank, instead of remitting a check for the amount, the board of supervisors, very likely, would have instructed the bank to keep the package of money intact, and apart from the bank's money, so that the board of supervisors would not need the protection of any such statute as Act No. 63 of 1926. This illustration, however, goes very far afield, and is not complimentary to the members of the board of supervisors of Jones County, Miss. I do not believe that there is a man in Jones County, Miss., who, if he had to send $7,932.30 to a New Orleans bank to pay an obligation falling due at the bank, would have so little business sense as to ship the amount in coin or currency, instead of sending a check, or New Orleans exchange, for $7,932.30. The Legislature does not enact laws to provide for cases that will never happen. Another illustration, suggested by Judge Cage, was that, if Jones County had sent the check to the Whitney National Bank, on which the check was drawn, and had instructed that bank to use the proceeds of the check for the payment of Jones County's bonds and coupons, Jones County would not have had a lien under Act No. 63 of 1926. Of course not, because, in that case, Jones County, or the party drawing the check, would have been a depositor, and hence an ordinary creditor, of the Whitney National Bank; and the check would not have been sent "for collection," in any sense. Judge Cage gave still another illustration which made the Jones County decision seem to him absurd, thus: If "A," in New Orleans, desiring to remit $1,000 to his bank in New York, carried $1,000 in currency to the Interstate Bank with a letter instructing the bank to transmit the money to the New York bank to be placed to "A's" credit, and, if "B," at the same time and with the same intention, should present to the Whitney Bank his check for $1,000, drawn on the Canal Bank, and instruct the Whitney Bank to collect the check and remit the $1,000 to "B's" bank in New York, to be placed to "B's" credit, "A" would not have a lien, but "B" would have a lien. And the judge asks: "In common sense and common justice, why the difference?" There would be no difference. "A" and "B" each would ask for and receive immediately a cashier's check, or New York exchange, to be sent to his New York bank. If the Whitney Bank should first cash "B's" check on the Canal Bank, before giving "B" a cashier's check or New York exchange for the $1,000, "B's" lien, under the act of 1926, would not last any

longer than the few minutes that it would take for the Whitney Bank to hand "B" the cashier's check or New York exchange for the $1,000. That is my understanding as to how such transactions are handled.

Cases arise sometimes where a court of last resort, in the interest of justice, is compelled to overrule one of its decisions and establish a new rule. But such instances arise only when the court has committed a palpable error, by oversight or inadvertence, and where the overruling of the decision can do no harm. A court of last resort is never justified in overruling a decision by which the court has given a reasonable and deliberate interpretation to a statute, particularly if the statute is one of vast importance or of general application in the commercial world, or if the interpretation has established a rule of property. In such cases, even though the statute may be one of doubtful meaning, the decision in which the court has declared what the statute means should not be overruled merely because of a change of opinion of one or more of the individual members of the court. The public is not concerned so much with the opinions of the individual members of the courts as with the right of the public to depend upon the stability of the judgments and decisions of the courts. An oscillating jurisprudence tends to impair that faith and confidence which the public should have in the decisions of the courts, and which is so essential to the administration of justice. An ever-changing jurisprudence hinders the practice and the teaching of law; for it prevents the making of an exact science of the profession of law.

As long as the court has not rendered a decision contrary to the decision that was rendered in the Jones County Case, and hence contrary to the decision that was rendered by the federal courts in their Jones County Case, the members of the bar will understand that the decision in the Jones County Case is not overruled.

I agree with Judge Cage that there is nothing in the provisions of the fourth section of Act No. 300 of 1910, p. 506, to justify the imposing of the penalty of forfeiture for a failure or neglect of a creditor of a bank in liquidation to file his claim with the bank commissioner and to make proof of the justness of the claim within the time limit fixed by the commissioner in the publication of his notice to all claimants other than depositors to file and make proof of their claims. This section of the statute declares that, as soon as practicable after the State Bank Commissioner has taken over an insolvent bank for the purpose of liquidating its affairs, he shall publish a notice, at least once a week for three months, "in such newspaper as he may select," calling upon all persons, other than depositors, who may have claims against the bank, to file their claims with the commissioner "and make legal proof as to the justice thereof, at a place and within a time not earlier than the last day of publication

of such notice to be specified therein." The court has construed the words "not earlier" to mean "not later." What the statute means is that the Bank Commissioner shall specify in the notice, which he shall publish at least once a week for three months in a newspaper to be selected by him, the place at which, and the period of time in which, he, the commissioner, will receive and pass upon the proofs of claims to be submitted by persons, other than depositors, having claims against the insolvent bank; which period of time, "to be specified" by the commissioner, shall begin "not earlier than the last day of publication of such notice." The period, to be fixed by the commissioner, during which he will receive and pass upon proofs of claims against the insolvent bank, may begin at any time *after* the last day of publication of the three months' notice, according to the convenience of the commissioner, but it must begin "not earlier than the last day of publication of such notice." It seems impossible that the Legislature intended to say to the State Bank Commissioner that he should give three months' notice to all persons (except depositors) having claims against the insolvent bank, of the time when and the place where he would receive and consider their proofs of claims, and at the same time forbid the claimants to file their claims after the last day of the three months' notice. Besides, why should the Legislature have to remind the Bank Commissioner that he could not give the creditors of the bank (other than depositors) three months' notice of the

time and place for the filing of their claims, and at the same time compel them to file their claims "earlier than the last day of publication of such notice." The commissioner would know, without being told, that there would be no use in continuing the publication of the notice for three months if he could make the time limit for filing the claims *earlier* than the end of the three months. The word "earlier" is used advisedly, because, in the same section, it is provided that the notice to depositors shall call upon them to present their claims not "later" than six months after the Bank Commissioner has taken over the insolvent bank.

I respectfully submit that it is unreasonable for the court to give the Bank Commissioner the arbitrary power—especially when the Legislature has not declared that he shall have the power—to deprive the creditors of a bank of their day in court, by publishing a notice "in such newspaper as he may select," calling upon the creditors to present their claims and make legal proof thereof *on or before the last day of publication of such notice.* In every instance where the law requires that a notice shall be published for a given time, before a specified judicial proceeding can be had, such as a sale of property under execution, or the homologation of an administrator's account, the proceeding cannot be had until the last day of publication of the notice has expired. In this case, the commissioner published the notice on January 25, and on February 1, 8, 15, 22, and on

March 1, 8, 15, 22, 29, and on April 5, 12, 19, and 26; and in the notice he declared: "Claims must be filed not later than April 26, 1934." In fact, therefore, the notice was not published for three full months before the expiration of the last day on which the claims were allowed to be filed; and the creditors were not informed by the commissioner's notice that his interpretation of the law would be that all creditors who failed to file their claims on or before the last day of publication would be forever barred from presenting their claims, even to the court having jurisdiction of the liquidation of the affairs of the bank.

The penalty of forfeiture of a claim for failure to present it within a given time is never implied unless the terms of the statute are such as to make the implication unavoidable. That is not the case here. It is said in the prevailing opinion in this case (176 So. 6) that, if the penalty of forfeiture is not to be imposed upon the creditors who fail to file and make proof of their claims within the time allowed by the commissioner, the notice calling upon the creditors to file and make proof of their claims has no legal or practical effect whatever. The purpose of the notice is to give the creditors an opportunity to have their claims recognized by the commissioner, and placed upon his account, without a lawsuit. It is said that there is nothing in the act that either expressly or impliedly authorizes the commissioner to reject claims that are not timely filed. It goes without saying that the commissioner may

not only reject but may refuse to pass upon a claim that is presented after the expiration of the time which he has allowed for the submission to him of proofs of claims, and that he may thus require proof in court of all of such belated claims. The reason why the statute puts a time limit (six months) on the right of claimants whose claims are rejected to bring suit on their claims is that such claimants are informed by the rejection of their claims that the commissioner will not recognize their claims unless compelled to do so by a judgment of court. The reason why a depositor's failure to respond to the notice that is given to him does not deprive him of his right to share ratably in the assets of the bank is that a depositor does not have to take any action on his claim. It is recognized as a valid claim on the books of the bank.

The fact that the National Bankruptcy Act (11 U.S.C.A. § 93 (n), and the statutes of several of the states on this subject, declare in terms that an action on a claim shall be barred if it is not presented within the time specified by the statute, only strengthens my belief that the Legislature of Louisiana did not intend to impose the penalty of forfeiture by mere implication. I do not believe that the Legislature would have given to the Bank Commissioner the unlimited and unqualified authority to select any newspaper in which to publish his notice, if the Legislature had intended that the failure of any creditor to respond to the notice should forever deprive him of his claim. The giving of such arbitrary power

to the commissioner might lead to a denial of due process of law, or of the equal protection of the law. In this instance, where the commissioner allowed no time at all beyond the last day of publication of his notice, and where neither the notice nor the statute itself gave any warning of the penalty, the judgment appears to me to be a denial of due process of law.

The fact that only 5 out of 98 claimants in this case avoided the penalty of forfeiture of their claims is a strong indication that the penalty is not warranted by the statute. It may be that all of the 98 claimants and their attorneys construed the statute as I construe it, and that the 5 who filed their claims within the three months did so merely as a precaution, or without any thought or fear of the penalty. But it seems certain that at least 93 out of the 98 claimants, and the same proportion of a hundred or more lawyers who represented them, did not interpret the statute as it is interpreted in the prevailing opinion in this case. If that is not true it is because some or all of the 93 claimants who failed to file their claims in time failed to see the notice which the commissioner published once a week for three months. In either case the percentage of victims indicates that the imposing of the penalty of forfeiture is an unwarranted interpretation of the statute.

For these reasons I respectfully decline to subscribe to the prevailing opinion in this case.